Labounty v. Crystal Rock Spring Water Co., No. 610-12-02 Wrcv (Teachout, J., Apr. 29, 2004)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

**STATE OF VERMONT**
**WINDSOR COUNTY, SS.**

| | | |
|---|---|---|
| **MATTHEW LABOUNTY** | ) | |
| | ) | **Windsor Superior Court** |
| **v.** | ) | **Docket No. 610-12-02 Wrcv** |
| | ) | |
| **CRYSTAL ROCK SPRING** | ) | |
| **WATER COMPANY** | ) | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, filed January 2, 2004**
**<u>Memorandum of Decision</u>**

Matthew LaBounty seeks compensation from his former employer, Crystal Rock Spring Water Company (Crystal Rock). In an eight-count complaint, LaBounty alleges that Crystal Rock breached a contract for employment and other obligations to him, and that it wrongfully subjected him to extreme emotional distress. Crystal Rock has filed a motion for summary judgment on all counts, and Mr. LaBounty opposes the motion. Plaintiff is represented by Norman Watts, Esq. Defendant is represented by Timothy E. Copeland, Jr.

**Facts**

The following undisputed facts are derived from the parties' statements of undisputed facts under V.R.C.P. 56(c)(2), to the extent they are supported by underlying evidence in the record.

Crystal Rock is a Connecticut corporation with a principal place of business in Watertown, Connecticut. It is registered to do business in Vermont. Crystal Rock employed Matthew LaBounty from January of 2001 to September 7, 2002. Prior to that, from January of 2000 to January of 2001, he was employed by Vermont Pure Springs, Inc. (Vermont Pure Springs). Prior to that, he was employed by New Jersey Machine, Inc. (New Jersey Machine), where he worked for 22 years.

In 1999, LaBounty was experiencing problems at New Jersey Machine, and he was thinking about leaving. In the spring of 1999 he applied for a job as a machinist at Dartmouth College, but that job went to another applicant who had a degree. At that point LaBounty was still a team leader at New Jersey Machine, and he was not prepared to leave "for just any job."

New Jersey Machine had laid off much of its work force and had only a "skeleton crew." To LaBounty, it looked as though there would be further layoffs. He thought he would be one of the last employees to be laid off, but as the company's business condition worsened, he became concerned that the shop would close completely and that he would lose his job without any warning.

The situation at New Jersey Machine was tense. Some of LaBounty's co-workers were leaving, and he did not like the prospect of "bringing in guys who didn't know anything." He did not like having to move around in the shop and do other people's jobs, but the situation was not serious enough for him to resign.

LaBounty had trouble getting along with one co-worker because he thought the co-worker could get away with standing around for an hour talking about motorcycles whereas others could not. He felt his supervisor was "on his case" because he was on everybody's case. LaBounty could have complained to the supervisor's manager, but he did not do so because he did not want to make waves. He thought a complaint might be used as an excuse to lay him off. His wife told him that, if his job at New Jersey Machine was really bothering him, he should find another job.

Shortly before he resigned from New Jersey Machine, LaBounty was issued a written warning; he was demoted and given a pay cut. His wife suggested that maybe he should find something else.

In the fall of 1999, LaBounty told his neighbor, Jeffrey Gates, that he was not happy at New Jersey Machine. Gates invited LaBounty to work for Vermont Pure Springs, where Gates worked. LaBounty felt that Gates wanted him to work for Vermont Pure Springs, and that maybe Gates was looking out for his interests.

LaBounty told Gates that he was not happy with the situation at New Jersey Machine, but that it was "a pretty good job" and that he wasn't willing to take "just any job." LaBounty didn't want to be a route driver. He didn't mind driving some, but he didn't want to drive a truck all the time. LaBounty and Gates discussed a job that included cleaning and repairing coffee machines at Vermont Pure Springs' facility in White River Junction, Vermont, fixing coffee makers and coolers "in the field," and "van work" – driving a smaller delivery van and delivering water to locations that had run out of water or that had been missed by route drivers or were too remote to service with a big truck.

Gates talked about the possibility that LaBounty could set up a service department in White River Junction. They did not discuss how much service work there would be, but LaBounty assumed that there would be a lot. He thought that he was being hired as a service

technician, and that he would set up a service department. He thought of this as a promise, but he does not remember Gates using the word "promise," and he is not sure what words Gates did use. There was no discussion of how long the job would be for, but LaBounty understood that his employment with Vermont Pure Springs would be "permanent" as opposed to "temporary."

There was no written job description for the position LaBounty discussed with Gates. There was no specific discussion of what percentage of time would be spent doing "van work." LaBounty did not ask for a written employment contract. He understood that service technicians did not have written contracts covering the terms of their employment.

LaBounty began working for Vermont Pure Springs on January 24, 2000. Soon thereafter, he received an employee handbook. Crystal Rock has submitted portions of an employee handbook for Vermont Pure Springs dated 3/25/98. The second page of the handbook states the following:

> As part of the Vermont Pure Springs Organization you are an employee at will (which means that you may be terminated from or choose to terminate your employment at any time with or without cause).

The handbook also states that:

> The programs outlined in this booklet should be regarded as guidelines, which in a developing business may change from time to time. This handbook is not a contract. The company retains the right to make decisions involving employment and to change these guidelines without notice. The company intends to conduct its work in a manner that is beneficial to the employees and Vermont Pure Springs, Inc. Therefore, all employment with this company is considered "At Will" employment.

LaBounty signed an acknowledgment that he received the employee handbook, on February 2, 2000. The acknowledgment states:

> I have this day received a copy of the Vermont Pure Springs, Inc. employee handbook, and I understand that I am responsible for reading the personnel policies and practices described within it.
>
> I agree to abide by the policies and procedures contained therein. I understand that the policies and benefits contained in this employee handbook may be changed, modified or deleted at any time. I understand that neither this manual nor any other communications by a management representative is intended to, in any way, create a contract of employment.

LaBounty does not remember anything in particular in the handbook other than a vacation provision. He was concerned because he understood he was getting more vacation than

3

other employees, which might make them mad. He understood his vacation allowance was something other than what the handbook said. There was not a special employee manual written for him.

While employed by Vermont Pure Springs, LaBounty worked long hours. He performed "some service work" but not as much as he had hoped. If anything needed to be fixed, he was "more than likely" the person who fixed it. However, he spent most of his time as a route driver, which was not the kind of work he wanted to do. He thought of water delivery as a degrading job. Typically, when he drove a route, he would work nine or ten hours, and then return to the terminal to load the truck for the next day's deliveries.

Even though he was disappointed with the type of work he was doing, LaBounty continued to work at Vermont Pure Springs. He did not pursue other job opportunities. He did not look into returning to his job at New Jersey Machine because he "wasn't interested" in going back to that particular company.

In January 2001, Crystal Rock assumed part of Vermont Pure Springs' operation. As a result, LaBounty became an employee of Crystal Rock. Crystal Rock and Vermont Pure Springs were and are separate corporations, both owned by Vermont Pure Holdings, Inc.

Sometime after Crystal Rock became his employer, LaBounty also received an employee manual. This book, entitled Employee Manual, Policies & Procedures, is undated, and it applies to employees of both Vermont Pure Springs and Crystal Rock. One of the introductory pages of the manual (entitled "Scope") states the following:

> This manual is designed to serve as a guide to managers and as a training tool, as well as a reference for all employees of Vermont Pure Holdings, Ltd. and its subsidiaries. It is not intended to constitute a contract either implied or in fact. Any provision may be modified at any time with or without notice. In areas of employment matters, the Company functions under an "employment at will" philosophy and the Company or an Employee are free to terminate employment at any time.
>
> This manual contains general statements of Company policy and is not intended to include explicit details of each policy. Nor is it intended to express or imply contract or promise that the polices discussed in it will be applied in all cases.
>
> The Company may add, change, or delete policies stated in the manual from time to time. The manual is intended to be kept up to date, but there may be times when policies or procedures may change before the manual can be revised and re-issued.

At page 3 (entitled "Failure to comply with any Vermont Pure Holdings, Ltd. Policy or

4

Procedure), the manual provides the following description of progressive discipline policies:

> Infractions and violations of any of the policies and procedures of the Company will result in disciplinary action being taken up to and including discharge.
>
>> First Offense:    Verbal Warning
>> Second Offense:    Written Warning
>> Third Offense:Final Written Warning
>> Fourth Offense:    Discharge
>
> The Company may skip or modify one or more steps as it deems appropriate.  All warning notices will remain in the Employee's personnel file for 3 years from the time of issuance.  A different violation than the original will result in the next level of disciplinary action being issued (the progression of disciplinary action is for all violations, not just the same type of violation).

At page 4 (entitled "Employment-At-Will"), the manual states that:

> Employees are employed at the will of the Company and subject to termination at any time, for any reason, with or without cause or notice.  At the same time, such employees may terminate their employment at any time and for any reason.
>
> No Company representative is authorized to modify this policy for any employee or enter into any agreement, oral or written, contrary to this policy.  Supervisory and management personnel may not make any representations to applicants or employees concerning the terms or conditions of employment with the Company that are not consistent with Company policies.  No statements made in pre-hire interviews or discussions, or in Company recruiting materials of any kind, are to alter the at-will nature of employment or imply that discharge will be only for cause.
>
> This policy may not be modified by statements contained in the manual or any other employee handbook, employment applications, Company recruiting material, Company memoranda, or other materials provided to applicants and employees in connection with employment.  None of these documents, whether individually or combined, are to create an expressed or implied contract of employment for a definite period, nor as an expressed or implied contract concerning any terms or conditions of employment.  Similarly, Company policies and practices with respect to any matter are not to be considered as creating any contractual obligations on the Company's part.  Statements of specific grounds for termination set

5

forth in this manual or in any other Company documents are examples only, not all-inclusive lists, and not intended to restrict the Company's right to terminate-at-will.

Beginning at page 32, the employee manual contains a section entitled "Standards of Conduct," starting with the following explanation:

Each employee has an obligation to observe and follow the Company's policies and to maintain proper standards of conduct at all times. If an individual's behavior interferes with the orderly and efficient operation of a department, corrective disciplinary measures will be taken.

Disciplinary action may include a verbal warning, written warning, a suspension without pay and/or discharge. The Company will determine the appropriate disciplinary action imposed. The Company does not guarantee that one form of action will necessarily precede another.

On page 33, the manual follows with a list of nine examples of misconduct that "may result in discipline up to and including discharge." The examples given are "not all inclusive."

Mr. LaBounty does not remember a lot about getting the manual. He remembers skimming it shortly after receiving it but not reading the whole thing. When he skimmed it he was not looking for anything in particular.

At his deposition, Mr. LaBounty testified as follows:

Q:          Are you contending that you had a contract with this company by virtue of a manual?

        A:          I never really looked at it as a contract.

During his employment with Crystal Rock, LaBounty's supervisors were Jeff Gates, Joel Whitney and Suzanne Auger. LaBounty was not doing as much service work as he wanted. However, he did not inquire about openings at other Crystal Rock facilities, nor did he inquire about any other jobs in the White River Junction, Vermont, and Lebanon, New Hampshire area. He continued to work for Crystal Rock. He did not experience any layoff or reduction in hours. His pay was never reduced, and he received two raises.

At his deposition, LaBounty testified as follows:

Q:          I need to be very specific here. Did anybody tell you that you're going to get a certain raise that you didn't end up getting?

        Q:          No.

6

Q:			You started at 12 and you did get raises eventually to $14, correct?

	Q:		Yes.

Q:			Are you contending there were other raises that you were promised that you did not receive?

	Q:		No.

On August 13, 2002, LaBounty was assigned to make deliveries in St. Johnsbury, Vermont, and in Littleton, New Hampshire, and he was also asked to make three extra deliveries at the end of the day, in Vershire, Vermont, in Norwich, Vermont, and in Lebanon, New Hampshire. However, by the time he was returning from St. Johnsbury, he had already worked over nine hours, and he knew he would have to load the truck for the next day, so he decided not to make the extra deliveries. He did not want to take the extra time, because he was already working a very long day. He did not tell his supervisor (Auger) about it at the end of that day, because she was on the phone.

The next day, August 14, LaBounty received a written warning for failing to make the three deliveries the previous day. After he did his route that day, he approached Mr. Whitney to ask him about why he had written the warning, and they discussed the matter for two or three minutes. Whitney was upset because customers had not received water they were expecting, and because LaBounty had not told anyone about it the previous day.

Later, LaBounty discussed the warning with Jeff Gates. Gates told LaBounty that Whitney had said he must have been "screwing up" because he should have been able to complete all his deliveries without any problem. LaBounty thought the criticism was unfair because the St. Johnsbury route was longer than usual with the extra stops in Littleton, New Hampshire. After completing the route, LaBounty had already worked a long day. He could have made the extra three stops, but that would have required him to work a very long day.

After receiving the written warning on August 14, 2002, LaBounty went home and never returned to work at Crystal Rock. He felt "devastated" at receiving the written warning. He felt that he could not go back to work, because he "just couldn't take it any more." He was an "emotional wreck." The next morning, August 15, he called in and said he would not be at work, but he did not explain why. He called in again on August 16 and said he was going to take a sick day. On Monday, August 19, he still did not report for work as scheduled; he recalls calling in and informing someone that he was taking "another personal day or sick day."

On Tuesday, August 20, LaBounty met with Jeff Gates at a diner and delivered a note stating, "I want to apply for a disability medical leave. I feel I have suffered unfair work practices and reverse discrimination which has led to medical problems." LaBounty asked Gates about getting some type of an insurance form, Workers' Compensation or whatever disability

7

insurance, and Gates said he would get him something. Gates told LaBounty that he could use his vacation time. At that time LaBounty had more than two weeks of vacation time, and some additional personal days and sick time. LaBounty did not say anything about how long he would be absent from work. LaBounty was not sure if he had any intention of ever returning to work at Crystal Rock even if he were medically able to do so. He did not want to go back.

On August 30, 2002, LaBounty received a letter from Crystal Rock dated August 27, 2002, enclosing a form entitled "Employer's First Report of Injury or Occupational Disease." A cover letter requested LaBounty to "please fill this out as thoroughly as possible and send back to me." A few days before then, Gates had hand-delivered a copy of the same form to LaBounty at his home.

No one at Crystal Rock gave LaBounty any specific time limit for filling out the form. The employment manual does not specify a time for returning a disability form. LaBounty estimated that he would have a few weeks to fill it out.

During the next few weeks, between the date when LaBounty first received a copy of the form (August 27, 2002), and September 19, 2002, Gates stopped at LaBounty's house three times and discussed his filling out the form and returning it.

LaBounty never returned the form to Crystal Rock. He was confused about how to fill it out. He was not thinking about returning to work at Crystal Rock. He did not think he could go back to work, because of his emotional condition.

On September 15, 2002, Jeffrey Gates wrote a letter of recommendation on behalf of Mr. LaBounty. The text of the letter is as follows:

> To Whom It May Concern:
>
> I am writing this letter in reference to Matthew Labounty. For the past two years Matthew has been employed at Vermont Pure Spring Water in White River Junction, Vermont. He has been an excellent employee and has had excellent attendance. Matthew has tremendous mechanical abilities with a strong attention to detail. Matthew works well with other employees and is a strong team player. I would recommend him completely to any employer. Please feel free to contact me with any questions.

On September 19, 2002, LaBounty received a letter from the insurance company that had provided him with insurance through his work, advising him that because his employment had been terminated on September 7, he no longer had insurance, but that he was eligible to purchase continued health insurance coverage through COBRA.

LaBounty then called Gates and asked why he had been fired. Gates responded that he

could not answer the question, because he had not fired LaBounty. On a later date, LaBounty again asked Gates why he had been fired, and Gates said that he guessed it was because LaBounty had not returned the form.

LaBounty admits there was a point when he decided not to bother with the form. He never asked for additional time to submit the form, nor did he ever seek to be rehired. He was not interested in being re-hired.

LaBounty consulted with a mental health therapist who advised him that he would not be able to go back to work, because he was a "nervous wreck." He did not consult with a medical doctor, a psychiatrist or a psychologist about his condition.

LaBounty does not contend that anyone at Crystal Rock was intentionally attempting to cause him emotional injury. However, he does blame Joel Whitney for upsetting him, by telling him one thing and telling Jeffrey Gates something else.

LaBounty agrees that it is part of a supervisor's job to criticize and correct when the supervisor believes someone is not performing his or her job correctly. He does not know if Crystal Rock should have known that the written warning would devastate him.


## Conclusions of Law

Plaintiff Matthew LaBounty pursues an eight-count complaint against Crystal Rock. Initially the complaint also named Vermont Pure Springs, Inc., and Vermont Pure Holdings, Inc., but those additional defendants have been dismissed from the case based on a stipulation. Crystal Rock has filed a motion for summary judgment, generally asserting that LaBounty has failed to submit *prima facie* evidence of his claims. LaBounty has argued that he does have evidence to support his claims, but the evidence in the record does not support his arguments.

### *Count 1.  Breach of Express Employment Contract*

In Count 1, LaBounty asserts that he had an express agreement with Jeffrey Gates that he would become a service technician, and that he would establish a service department for Vermont Pure Springs. He maintains that this agreement was breached when he was later assigned to work as a delivery truck driver which had no career or future advantages, and that as a result he suffered monetary and career losses.

The problem with LaBounty's claim is that there is no evidence of an express agreement with either Vermont Pure Springs or Crystal Rock. It is undisputed that LaBounty and Gates discussed the possibility that LaBounty would set up a service department in White River Junction. LaBounty thought that he was being hired as a service technician, but he does not remember Gates making any specific promise to that effect. LaBounty is not sure what words Gates did use. There was no written job description, and there was no specific discussion of what percentage of time would be spent doing "van work." In short, LaBounty has not presented

9

evidence to demonstrate that the work assignments breached any definite agreement.  See *Madden v. Omega Optical, Inc.*, 165 Vt. 306, 311-12 (1996) (vague allegations of representations were insufficient to show enforceable contract term).

*Count 2.  Promissory Estoppel*

In Count 2, LaBounty pursues an alternate theory that Crystal Rock breached enforceable promises to him concerning his work assignments.  A claim of promissory estoppel requires a demonstration that the employer's actions were "in breach of a specific promise made by the employer that the employer should have reasonably expected to induce detrimental reliance on the part of the employee, and that the employee did in fact detrimentally rely on the promise." *Dillon v. Champion Jogbra, Inc.*, 13 Vt.L.W. 357, 359 (2002) (citation omitted).

LaBounty's claim of promissory estoppel suffers from the same problems as his claim based on express contract.  He has failed to present evidence of a specific promise that the employer has breached.   The evidence shows at best that Jeff Gates gave him a general description of what the job was likely to be as of January 2000.  This is not a sufficient factual basis for a claim of promissory estoppel.

*Count 3.  Breach of Implied Employment Contract*

In Count 3, LaBounty claims that Crystal Rock breached an implied term of continued employment when it "fired" him on September 7, 2002.  He maintains that the company's action violated provisions for "progressive discipline" found in the employee manual, and that nothing he did provided sufficient cause for termination under the section entitled "standards of conduct."

Generally, "an employment contract for an indefinite term is an 'at-will' agreement, terminable at any time, for any reason or for none at all." *Ross v. Times Mirror, Inc.*, 164 Vt. 13, 18 (1995) (original quotation from *Sherman v. Rutland Hospital, Inc.*, 146 Vt. 204, 207 (1985)). However, "provisions of a personnel policy manual may unilaterally alter the at-will relationship." *Id*. at 20 (citing *Taylor v. National Life Ins. Co.*, 161 Vt. 457, 464-465 (1993)).  If an employee manual establishes a progressive discipline system, and states that it applies to all employees and will be carried out in a "fair and consistent manner," those terms conflict with any presumptive 'at-will' relationship, and they may give rise to an implied contract. *Dillon*, 13 Vt.L.W. at 359.

However, LaBounty has not cited to any provision of the Crystal Rock employee manual requiring the company to apply the progressive discipline steps in a fair and consistent manner. On the contrary, the section describing the system states clearly:  "The Company may skip or modify one or more steps as it deems appropriate."  Similarly, the section on "standards of conduct" also seeks to preserve the company's discretion in matters of discipline.  The paragraph preceding the list of examples of misconduct stresses the company's discretion, as follows:

> Disciplinary action may include a verbal warning, written warning, a suspension without pay and/or discharge. The Company will determine the appropriate disciplinary action imposed. The Company does not guarantee that one form of action will necessarily precede another.

Thus, the provisions cited by LaBounty differ from those featured in *Dillon*. They do not stress fairness or consistency, and they do not conflict with the accompanying disclaimers stressing the 'at-will' nature of the employment. Under these circumstances, LaBounty's employment with Crystal Rock was "at-will," and the company reserved its right to terminate the relationship at any time.

Moreover, Crystal Rock asserts that LaBounty actually abandoned his employment. Under this theory, Crystal Rock had good cause to terminate LaBounty's employment on September 7, 2002, based on his absence coupled with a failure to clarify his intentions. On August 15, 16, and 19, he called in to say he would not be at work, and on August 20, he met with Gates and told him he wanted to apply for a disability medical leave. By the end of August, Crystal Rock twice provided him with an application form to fill out. However, LaBounty never did return to work, nor did he submit the application, nor did he ever express an intention or desire to return to work. Under the circumstances, Crystal Rock was justified in concluding that he had abandoned his employment. See *Peeples v. Coastal Office Products, Inc.*, 64 Fed.Appx. 860, 2003 WL 21019353 (4th Cir. 2003) (absent any explanation for when employee would return to work, or other meaningful clarification, employer was justified in concluding that employee had abandoned the position); *Forde v. IBM Corp.*, 2003 WL 740220 (S.D.N.Y. 2003) (employer had ample basis to believe that employee had abandoned the job, and was acting well within its business prerogative to terminate the employment on that ground). Thus, if Crystal Rock needed good cause to terminate the employment, it had good cause based on abandonment.

### Count 4. Breach of the Covenant of Good Faith and Fair Dealing (Express Employment Contract)

LaBounty alleges that Crystal Rock's actions breached the covenant of good faith and fair dealing that exists in every contract. He has not explained how Count 4 differs from Count 1, although the complaint points out that the covenant "protects the parties from 'bad faith' conduct that violates 'community standards of decency, fairness or reasonableness.'"

An implied covenant of good faith and fair dealing exists in every contract, "to ensure that parties to a contract act with 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'" *Carmichael v. Adirondack Bottled Gas Corp.*, 161 Vt. 200, 208 (1993) (quoting Restatement (Second) of Contracts § 205 comment a (1981)). However, a claimed breach of the covenant of good faith and fair dealing cannot support a separate cause of action as the basis for a remedy for wrongful termination where the record fails to show the existence of any contract or other enforceable promise. *Ross*, 164 Vt. at 23.

11

LaBounty claims that Crystal Rock failed to give him the work assignments he had hoped for, based on his earlier discussions with Jeffrey Gates. However, he has not shown that either Vermont Pure Springs or Crystal Rock have violated any specific promises made to him. He has not cited to evidence in the record showing that Crystal Rock violated the "community standards of decency, fairness, or reasonableness" that the covenant of good faith and fair dealing seeks to protect. *Boulton v. CLD Consulting Engineers, Inc.*, 2003 VT 72, ¶ 12, 14 Vt.L.W. 238, 240 (citing *Carmichael*). "[N]othing in the record suggests that [Crystal Rock's] executives abused their authority or lacked a reasonable basis for their actions with respect to plaintiff." *Id.* ¶ 13.

## Count 5. Breach of the Covenant of Good Faith and Fair Dealing (Implied Employment Contract)

LaBounty again alleges that Crystal Rock's actions breached the covenant of good faith and fair dealing that exists in every contract, but he bases Count 5 on the implied contract alleged in Count 3. He has not explained how Count 5 differs from Count 3. Once again, the claim based on the covenant fails because the contract claim has failed. A covenant as to tenure in an unmodified at-will contract would conflict with the employment-at-will doctrine and result in "unreasonable judicial interference into what is a private relationship." *Ross*, 164 Vt. at 23.

LaBounty claims Crystal Rock violated an implied contract by terminating his employment without following progressive discipline steps outlined in the employee manual. However, nothing in the manual states that the progressive discipline steps are required, and in fact LaBounty has testified that he "never really looked at it as a contract." Once again, "nothing in the record suggests that [Crystal Rock's] executives abused their authority or lacked a reasonable basis for their actions with respect to plaintiff." *Boulton*, 2003 VT 72, ¶ 13, 14 Vt.L.W. 238, 240.

## Count 6. Illegal Retaliatory Discharge From Employment (Violation of Vermont's Workers' Compensation Statute)

In Count 6, LaBounty claims that Crystal Rock unlawfully discharged him because he asserted a claim for benefits under the Workers' Compensation statutes, under 21 V.S.A. § 710. He claims that his August 20, 2002 note, stating that he wanted to apply for a disability medical leave, was the reason why Crystal Rock laid him off on September 7, 2002.

> To succeed on [his] retaliation claims, plaintiff must show that (1) [he] was engaged in a protected activity, (2) the [employer] knew of that activity, (3) plaintiff suffered adverse employment action, and (4) a causal connection exists between plaintiff's protected activity and the adverse employment action. *Gallipo v. City of Rutland*, 163 Vt. 83, 92 . . . (1994). Plaintiff may establish the required causation indirectly through the timing of [his] protected activity and the [employer's] alleged retaliatory actions. *Id.* at 93 . . . . If plaintiff establishes a prima facie case of retaliation, [the employer] must proffer a legitimate,

nondiscriminatory reason for [its] actions. *Murray v. St. Michael's College*, 164 Vt. 205, 210 . . . (1995). Plaintiff then must prove by a preponderance of the evidence that the [employer's] reasons for [its] actions are a pretext for discrimination. *Id.*

*Mellin v. Flood Brook Union School District*, 173 Vt. 202, 211 (2001). Also see *Beckmann v. Edson Hill Manor*, 171 Vt. 607 (2000).

LaBounty's apparent theory is that Crystal Rock terminated him because he was considering filing a workers' compensation claim. Crystal Rock stresses that he never actually filed a claim. Nevertheless, he did tell Crystal Rock that he wanted to apply for a disability medical leave. He claims that the timing is suspicious, because Crystal Rock laid him off less than three weeks later. However, Crystal Rock has set forth a legitimate reason for its action, and LaBounty has not submitted any evidence to show that Crystal Rock's reason is a pretext for discrimination.

LaBounty points out that the second time he asked Gates why he had been fired, Gates responded that he guessed it was because LaBounty had not returned the form. (LaBounty deposition at 302). However, Gates' response is consistent with Crystal Rock's explanation that the termination was based on abandonment. This evidence does not show that Crystal Rock terminated him because he was asserting his rights, nor does it show that Crystal Rock's claim of abandonment is a mere pretext. The evidence does not support LaBounty's claim that Crystal Rock discriminated against him because he was exercising his right to file a claim for workers' compensation.

## Count 7. Retaliatory Discharge From Employment (Public Policy Violation)

In response to Crystal Rock's motion, LaBounty states that he does not intend to pursue this claim. Summary judgment will be granted on this count.

## Count 8. Intentional Infliction of Emotional Distress

Plaintiff's Count 8 alleges intentional infliction of emotional distress. The amended complaint refers to the earlier allegations, asserts that the defendant's actions and treatment of plaintiff were extreme and outrageous, and alleges that defendant intentionally or recklessly inflicted severe emotional distress.

Plaintiff bears the burden of showing "outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct." *Baldwin v. Upper Valley Services, Inc.*, 162 Vt. 51, 55 (1994) (citations omitted). "The standard for establishing outrageous conduct is a high one: the conduct must be so outrageous in character and so extreme in degree as to go beyond all possible bounds of decent and tolerable conduct in a civilized community." *Farnum v. Brattleboro Retreat, Inc.*, 164 Vt. 488, 497 (1995) (citation

13

omitted). "[M]ere termination of employment will not support a claim for intentional infliction of emotional distress. However, if the manner of termination evinces circumstances of oppressive conduct and abuse of a position of authority vis-à-vis plaintiff, it may provide grounds for the tort action." *Crump v. P & C Food Markets, Inc.*, 154 Vt. 284, 296 (1990).

In this case, Mr. LaBounty's claims of outrageous conduct consist primarily of Crystal Rock's assigning him to work long hours delivering water on a truck route, criticizing him when he missed deliveries, and then terminating his employment when he stayed home to recuperate from the emotional stress. LaBounty was taken off the Crystal Rock payroll, but, in contrast to *Crump*, he was neither accused of criminal misconduct nor subjected to lengthy interrogation. Plaintiff alleges a series of indignities, but he has not set forth any one incident of behavior "that transcends the ignoble and vast realm of unpleasant and often stressful conduct in the workplace." *Denton v. Chittenden Bank*, 163 Vt. 62, 67 (1994). Crystal Rock's conduct in concluding that he had abandoned his at-will employment does not satisfy this standard given his own failure to either return the completed form or otherwise communicate with Crystal Rock concerning his status for a period in excess of two weeks. He has not shown "outrageous conduct" by the defendant that would satisfy the essential elements of his claim under count 8 because a reasonable jury could not find that Crystal Rock's conduct went "beyond all possible bounds of decent and tolerable conduct in a civilized community." *Farnum* at 497. Crystal Rock is entitled to summary judgment on count 8.

*Punitive Damages*

Mr. LaBounty's Complaint also requests an award of punitive damages. However, punitive damages may be awarded only where the defendant's liability for actual damages has been established. *Allard v. Ford Motor Credit Co.*, 139 Vt. 162, 164 (1980). Based on the conclusion that LaBounty is not entitled to any award for compensatory damages, Crystal Rock is entitled to summary judgment on his request for punitive damages.

**ORDER**

Defendant Crystal Rock's Motion for Summary Judgment is granted on all counts.

Dated this _____ day of April, 2004.

_____
Hon. Mary Miles Teachout
Superior Judge

14

**STATE OF VERMONT**
**WINDSOR COUNTY, SS.**

MATTHEW LABOUNTY )
                                              )       **Windsor Superior Court**
v.                                         )       **Docket No. 610-12-02 Wrcv**
                                                )

CRYSTAL ROCK SPRING )
WATER COMPANY )

## <u>JUDGMENT</u>

       This action came on for consideration of the Motion of Defendant for Summary Judgment, and the court, on April 28, 2004 having granted Defendant's Motion for Summary Judgment,

       It is ORDERED and ADJUDGED that judgment is entered for the Defendant, and Plaintiff shall take nothing on the claim.

       Date at this ____ day of April, 2004.

 

_____
Hon. Mary Miles Teachout
Superior Judge

15