**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 17-1503

VARIETY STORES, INC., a Delaware corporation,

Plaintiff - Appellant,

v.

WAL-MART STORES, INC., a Delaware corporation,

Defendant - Appellee.

_____

No. 17-1644

VARIETY STORES, INC., a Delaware corporation,

Plaintiff - Appellee,

v.

WAL-MART STORES, INC., a Delaware corporation,

Defendant - Appellant.

No. 17-1906

VARIETY STORES, INC., a Delaware corporation,

Plaintiff - Appellee,

v.

WAL-MART STORES, INC., a Delaware corporation,

Defendant - Appellant.

─────────────

Appeals from the United States District Court for the Eastern District of North Carolina, at Raleigh. Terrence W. Boyle, District Judge. (5:14-cv-00217-BO)

─────────────

Argued: January 25, 2018                    Decided: April 24, 2018

─────────────

Before KING, FLOYD, and THACKER, Circuit Judges.

─────────────

Dismissed in part, affirmed in part, vacated in part, and remanded by published opinion. Judge Floyd wrote the opinion in which Judge King and Judge Thacker joined.

─────────────

**ARGUED:** W. Thad Adams, III, SHUMAKER, LOOP & KENDRICK, LLP, Charlotte, North Carolina, for Appellant/Cross-Appellee. Mark S. Puzella, FISH & RICHARDSON P.C., Boston, Massachusetts, for Appellee/Cross-Appellant. **ON BRIEF:** Samuel A. Long, Jr., Christina D. Trimmer, SHUMAKER, LOOP & KENDRICK, LLP, Charlotte, North Carolina; Scott P. Shaw, CALL & JENSEN, A PROFESSIONAL CORPORATION, Newport Beach, California, for Appellant/Cross-Appellee. William W. Wilkins, Kirsten E. Small, NEXSEN PRUET, LLC, Greenville, South Carolina; John A. Dragseth, Minneapolis, Minnesota, R. David Hosp, Sheryl Koval Garko, Boston, Massachusetts, Elizabeth E. Brenckman, Michael A. Anderson, Jeffrey C. Mok, FISH & RICHARDSON P.C., New York, New York, for Appellee/Cross-Appellant.

─────────────

FLOYD, Circuit Judge:

This appeal arises from a protracted trademark dispute between appellant Variety Stores, Inc. ("Variety"), and cross-appellant and appellee Wal-Mart Stores, Inc. ("Walmart"). The district court granted partial summary judgment in Variety's favor, finding Walmart liable for trademark infringement. Following a subsequent bench trial, the district court ordered Walmart to disgorge $32.5 million in profits made from 16 states and the District of Columbia. The district court denied Variety's request for a separate jury trial to determine additional non-disgorgement damages and ordered Walmart to reimburse Variety for reasonable costs and attorneys' fees. Variety appeals from the district court's calculation of disgorged profits and denial of its request for a jury trial. Walmart cross-appeals from the district court's grant of partial summary judgment in Variety's favor and award of profit disgorgement, costs, and attorneys' fees. Because the district court improperly granted summary judgment in Variety's favor, we dismiss the appeal in part, affirm in part, vacate in part, and remand.

I.

This trademark dispute concerns whether Walmart's use of the mark "Backyard Grill" on its grills and grilling supplies infringes on Variety's use of its registered mark, "The Backyard," and unregistered marks, "Backyard" and "Backyard BBQ," that it claims it owns.

Variety is a Delaware corporation that operates retail stores in 16 states and the District of Columbia and sells various outdoor products, such as lawn and garden

3

equipment, grills, and grilling products. In 1997, Variety purchased Rose's Stores, Inc. ("Rose's"), and acquired its registered trademark "The Backyard" for "retail store services in the field of lawn and garden equipment and supplies." J.A. 61. When Rose's applied for the trademark in 1994, the U.S. Patent and Trademark Office ("USPTO") registered the mark without requiring proof of secondary meaning, which is required when the submitted mark is relatively weak and generally unregistrable. At some point, Variety began using variations of "The Backyard"—"Backyard" and "Backyard BBQ"— for selling not just lawn and garden equipment but also grills and grilling supplies.

In late 2010, Walmart decided to adopt a private label for its grills and grilling supplies. According to Karen Dineen, Walmart's Senior Director for General Merchandise,[1] at the time, Walmart was selling its grilling products under multiple manufacturer names and concluded that having one uniform label would improve branding and lower costs. Walmart's branding team embarked on an iterative

---

[1] We limit our recitation of the record in the following manner. First, because Dineen's deposition testimony has been sealed, we rely on unsealed, publicly available sources in reciting the relevant portions of Dineen's testimony. Additionally, in reviewing the district court's summary judgment order, we limit our review to the portion of the record that was presented to the district court as the summary judgment record. *See Beverati v. Smith*, 120 F.3d 500, 503 (4th Cir. 1997) ("In general, though, when this court reviews the grant of summary judgment, it considers the record before the district court de novo . . . ."); *Erie Ins. Exch. v. Stark*, 962 F.2d 349, 352 (4th Cir. 1992) ("The critical issue on appeal is whether the district court erred in determining that, as a matter of law on the summary judgment record . . . ."). Here, Walmart invites us to consider the subsequent bench trial testimonies to review the district court's summary judgment order. Because the bench trial testimonies were not before the district court at the summary judgment phase, we will not consider them to review the grant of summary judgment.

development process of generating a list of brand names, performing a legal clearance for trademarks, and conducting surveys to gauge customer reactions to those names.

Walmart considered brand names such as "Grill Works," "Backyard Barbeque,"[2] and "Backyard BBQ," but it ultimately adopted "Backyard Grill" as the name for its grills. Dineen testified that Walmart's legal team advised the branding team not to adopt "Grill Works," "Backyard Barbeque," and "Backyard BBQ." In a subsequent declaration, Dineen noted that Walmart knew that Variety owned the federal trademark registration for "The Backyard" mark for lawn and garden equipment and supplies. Dineen further submitted, however, that "Walmart was not aware of any of Variety's claimed unregistered or 'common law' uses of marks incorporating the word 'backyard' in connection with any products, including lawn and garden products." J.A. 1515. Dineen also explained that Walmart typically "comparison shop[s]" in its large competitors' stores, such as Lowe's and Home Depot, and that it was unlikely that "somebody from [Walmart] would have gone to a Variety store somewhere just see how they were using their mark." Walmart Opening Br. 25; *see also* J.A. 1612.

Ultimately, Walmart decided to adopt "Backyard Grill" and began selling grills bearing that mark in late 2011. On August 17, 2011, Walmart filed its trademark application for "Backyard Grill" with the USPTO, while disclaiming the exclusive right

---

[2] The district court's summary judgment order spells this term as "Backyard Barbecue," whereas the parties on appeal spell this as "Backyard Barbeque." We adopt the parties' spelling.

5

to use the word "Grill." On July 10, 2012, the USPTO published Walmart's application for 30 days to allow the public to file any opposition to the registration.

Variety became aware of Walmart's trademark application for "Backyard Grill" and filed an opposition to the application with the Trademark Trial and Appeal Board ("TTAB") in July 2012. After limited discovery before the TTAB, Variety commenced civil action in the federal district court in April 2014, which stayed the TTAB proceedings. Variety brought claims for trademark infringement and unfair competition under federal law, 15 U.S.C. §§ 1114, 1125, and unfair and deceptive practices and trademark infringement under North Carolina law, N.C. Gen. Stat. §§ 75-1.1, 80-11.

Variety moved for partial summary judgment with regards to Walmart's liability. Walmart also cross-moved for summary judgment. Variety submitted evidence showing that it had used "The Backyard" and its variations "Backyard" and "Backyard BBQ" (collectively, the " 'Backyard' marks") since 1993; sold over $56 million worth of products bearing the "Backyard" marks, with over $8 million in sales of grills and grilling accessories; and spent "millions" to advertise its products. Variety, however, did not quantify exactly how much it spent on promoting the mark on grills or grilling products. Variety also did not provide any evidence of confusion among consumers.

Similarly, Walmart submitted extensive evidence in support of its summary judgment motion. Most notably, Walmart submitted two expert surveys conducted after the commencement of this suit to gauge the level of actual confusion among customers. These surveys asserted that customers did not confuse the two marks. Additionally, Walmart presented evidence showing that: (1) 527 registered trademarks and pending

6

trademark applications contained the term "backyard," (2) 121 of these marks were in the same class for which Variety's "The Backyard" mark is registered, and (3) 23 registered marks or pending applications including the term "backyard" list "grill" in the description of goods covered by the marks.

After a hearing, the district court granted partial summary judgment in Variety's favor on December 8, 2015. The district court held, first, that all of Variety's marks were protectable pursuant to its trademark registration and common law right and beyond the registered purpose of retail sales of lawn and garden products, and, second, that Walmart's mark created a likelihood of confusion. Regarding the likelihood of confusion analysis, the district court concluded that: Variety's "Backyard" marks were strong conceptually and commercially; Walmart ignored its own counsel's advice and adopted "Backyard Grill," thus exhibiting an intent to confuse consumers; the surveys showing no confusion lacked persuasiveness; and this was a case involving a large corporation trying to outlast a smaller company in competition or litigation.

Following summary judgment, the remedies phase of the litigation began. After a bench trial, the district court ordered Walmart to disgorge approximately $32.5 million in profits. The district court calculated the amount of disgorgement not based on Walmart's nationwide sales ($910 million), but based on Walmart's sales from the 17 jurisdictions in which Walmart and Variety directly competed ($395 million). In accordance with the parties' stipulation that Walmart be able to deduct the cost of goods sold, the district court deducted $285.5 million. The district court further deducted approximately $77 million in selling, general, and administrative ("SG&A") costs associated with Walmart's

7

fixed overhead. Following the $32.5 million disgorgement order, Variety moved for a separate jury trial to determine additional non-disgorgement damages. The district court denied the motion on the grounds that disgorgement provided a sufficient remedy and non-disgorgement damages would amount to an inequitable double remedy. The district court also ordered Walmart to pay costs and attorneys' fees.

On appeal, Variety argues that the district court erred in: (1) geographically limiting the scope of disgorgement to the 17 jurisdictions in which Variety owns stores and competed with Walmart, (2) allowing Walmart to deduct SG&A costs, and (3) denying its request for a jury trial to determine additional non-disgorgement damages. Walmart cross-appeals by arguing that the district court erred in: (1) granting partial summary judgment in Variety's favor, (2) ordering disgorgement of profits, and (3) awarding costs and attorneys' fees to Variety.

## II.

"We review a district court's grant of summary judgment de novo." *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017). Although, in ordinary cases, we would only briefly discuss the applicable standard of review, "[w]hen 'the opinion below reflects a clear misapprehension of summary judgment standards,' . . . further elaboration is warranted." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (quoting *Tolan v. Cotton*, 134 S. Ct. 1861, 1868 (2014) (per curiam)). A correct application of the Rules is especially important in a protracted civil action such as this

8

one, in which subsequent proceedings are closely intertwined with the disposition of the summary judgment motion.

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." *Jacobs*, 780 F.3d at 568 (internal quotation marks omitted). Thus, at the summary judgment phase, "[t]he pertinent inquiry is whether 'there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.' " *Reyazuddin v. Montgomery Cty., Md.*, 789 F.3d 407, 413 (4th Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

Once the moving party makes a Rule 56 motion, "[t]he burden is on the nonmoving party to show that there is a genuine issue of material fact for trial . . . by offering 'sufficient proof in the form of admissible evidence . . . .' " *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993)). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs*, 780 F.3d at 568 (quoting 10A Charles A. Wright et al., Federal Practice & Procedure § 2728 (3d ed. 1998)). Therefore, courts must " 'view the evidence in the light most favorable to the nonmoving party' and refrain from 'weigh[ing] the evidence or mak[ing] credibility determinations.' " *Lee*, 863 F.3d at 327 (quoting *Jacobs*, 780 F.3d

9

at 568–69). A court improperly weighs the evidence "[b]y failing to credit evidence that contradict[s] some of its key factual conclusions," *Tolan*, 134 S. Ct. at 1866, or by failing to "draw reasonable inferences in the light most favorable to the [nonmoving party]," *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotation marks omitted). Having articulated the applicable summary judgment standard, we now turn to this cross-appeal.

III.

The Lanham Act protects trademark registrants from "any reproduction, counterfeit, copy, or colorable imitation of a registered mark" by allowing the registrant to commence a civil action against trademark infringers for disgorgement of profits or other damages. 15 U.S.C. § 1114(1). To demonstrate trademark infringement, a plaintiff must show both (1) "that it owns a valid and protectable mark," and (2) "that the defendant's use of a 'reproduction, counterfeit, copy, or colorable imitation' of that mark creates a likelihood of confusion." *CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 267 (4th Cir. 2006) (citation omitted) (quoting § 1114(1)(a)).

We turn to examine the district court's grant of partial summary judgment in Variety's favor. Because we find the likelihood of confusion analysis dispositive, we first review the district court's conclusion that Walmart's mark created a likelihood of confusion. To determine whether a likelihood of confusion exists, we examine nine factors:

> (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace;
> (2) the similarity of the two marks to consumers;

10

(3) the similarity of the goods or services that the marks identify;

(4) the similarity of the facilities used by the markholders;

(5) the similarity of advertising used by the markholders;

(6) the defendant's intent;

(7) actual confusion;

(8) the quality of the defendant's product; and

(9) the sophistication of the consuming public.

*Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 314 (4th Cir. 2017) (quoting *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 393 (4th Cir. 2017)). "Not all of these factors will be relevant in every trademark dispute, and there is no need for each factor to support [the plaintiff's] position on the likelihood of confusion issue." *Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 171 (4th Cir. 2006). Likelihood of confusion is "frequently a fairly disputed issue of fact on which reasonable minds may differ" and "a matter of varying human reactions to situations incapable of exact appraisement." *Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 318 (4th Cir. 1992) (internal quotation marks omitted). Therefore, these factors "are not meant to be a rigid formula for infringement," but "only a guide—a catalog of various considerations that may be relevant in determining the ultimate statutory question of likelihood of confusion." *Id.* at 320 (internal quotation marks omitted).

Here, the district court determined that all the factors, except for actual confusion, favored Variety and concluded that Walmart's mark created a likelihood of confusion. On appeal, Walmart challenges the district court's analysis of the strength of Variety's

11

mark (Factor 1), the similarity of the two marks to consumers (Factor 2),[3] the similarity of the facilities used by the markholders (Factor 4), Walmart's intent to confuse (Factor 6), and actual confusion (Factor 7). For the following reasons, we conclude that there are genuine disputes of material fact as to whether a likelihood of confusion exists and, thus, that the district court improperly granted summary judgment in Variety's favor.

A.

In reviewing Factor 1, we examine the strength or distinctiveness of Variety's marks and find that the strength of Variety's marks is genuinely disputed. This Court has observed that this factor is " 'paramount' in determining the likelihood of confusion" since a consumer is unlikely to associate a weak or undistinctive mark with a unique source "and consequently will not confuse the allegedly infringing mark with the senior mark." *Grayson O*, 856 F.3d at 314–15 (quoting *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984)). The mark's overall strength or distinctiveness "comprises both conceptual strength and commercial strength." *Id.* at 315. Here, we find that the overall strength factor is genuinely disputed because, although we find Variety's marks conceptually weak, their commercial strength is genuinely disputed.

i.

Turning first to conceptual strength, we find Variety's marks conceptually weak. "Measuring a mark's conceptual or inherent strength focuses on the linguistic or

---

[3] Walmart's opening brief misstates that it takes issue with Factor 3, but the actual argument developed pertains to Factor 2.

graphical 'peculiarity' of the mark, considered in relation to the product, service, or collective organization to which the mark attaches." *CareFirst*, 434 F.3d at 269 (quoting *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990)). The mark's "peculiarity" is measured by "placing the mark 'into one of four categories of distinctiveness: (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful.'" *Grayson O*, 856 F.3d at 315 (quoting *George*, 575 F.3d at 393–94). Here, the parties disagree whether Variety's marks are descriptive or suggestive.

Descriptive marks—such as "5 Minute glue" or "After Tan post-tanning lotion"—"merely describe a function, use, characteristic, size, or intended purpose of the product" and are not inherently distinctive. *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 464 (4th Cir. 1996). Descriptive marks do not receive trademark protection unless "they have acquired a 'secondary meaning,' that is, if 'in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself.'" *Id.* (quoting *Dayton Progress Corp. v. Lane Punch Corp.*, 917 F.2d 836, 839 (4th Cir. 1990)). "[T]he prime element of secondary meaning is a *mental association* in buyers' minds between the alleged mark and a single source of the product." *Dayton Progress*, 917 F.2d at 839 (quoting 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 15:2, at 659 (2d ed. 1984)). This Court has stated that "Coca-Cola® is probably the paradigm of a descriptive mark that has acquired a secondary meaning," *Sara Lee*, 81 F.3d at 464, because it went from merely describing a drink made from coca leaves and cola nut to signifying "to most persons . . . [a] familiar product to be had everywhere," *Coca-Cola Co. v. Koke Co. of Am.*, 254 U.S. 143, 146

13

(1920), *superseded by statute as stated in Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159 (1995).

Suggestive marks—such as "Orange Crush®"—merely suggest a product's features and require some imagination on the part of the consumer. *Grayson O*, 856 F.3d at 315. Suggestive marks, along with fanciful marks, "are inherently distinctive, and thus receive the greatest protection against infringement." *Id.* (quoting *Sara Lee*, 81 F.3d at 464). Drawing a line between descriptive marks and suggestive marks can often be difficult, and "[a] helpful rule of thumb is that if the mark imparts information directly, it is descriptive, but if it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive." *Retail Servs. Inc. v. Freebies Publ'g*, 364 F.3d 535, 539 (4th Cir. 2004) (internal quotation marks omitted). Furthermore, "[b]ecause the USPTO will not register descriptive marks without a showing that the mark has acquired 'secondary meaning,' the USPTO's determination that it does not need proof of secondary meaning 'constitutes *prima facie* evidence' that the mark is suggestive." *Grayson O*, 856 F.3d at 315 n.5 (quoting *George*, 575 F.3d at 395).

We need not definitively resolve whether Variety's marks are suggestive or descriptive, or whether we should consider the marks separately. Even if we assume that Variety's marks are suggestive, these marks are conceptually weak. This Court has noted on numerous occasions that "the suggestive 'designation does not resolve the mark's conceptual strength.'" *Id.* at 315 (quoting *CareFirst*, 434 F.3d at 270). "Rather, the frequency of prior use of a mark's text in other marks, particularly in the same field of

14

merchandise or service, illustrates the mark's lack of conceptual strength." *Id.* (internal quotation marks omitted). "[C]onsumers are unlikely to associate a mark with a unique source if other parties use the mark extensively." *Id.* In *Grayson O*, we concluded that the plaintiff's mark for its hair products, "F 450," was conceptually weak, because "450" indicated the temperature at which hair melts, and the defendant had "presented numerous instances of other uses of '450' in the haircare industry, including some that were in use or registered prior to [the plaintiff's] registration of its mark." *Id.* at 315–16. In doing so, we also noted that "[i]f [the plaintiff's] mark was 'truly a distinctive term, it is unlikely that . . . many other businesses in the [haircare] industry would independently think of using the same mark or similar variants of it.'" *Id.* at 316 (quoting *CareFirst*, 434 F.3d at 270).

Applying these principles to this appeal, we first note that, in considering Variety's motion for partial summary judgment, the district court erroneously failed to credit Walmart's evidence and view the evidence in the light most favorable to Walmart. *See Tolan*, 134 S. Ct. at 1866; *Jacobs*, 780 F.3d 568–69. Walmart presented evidence suggesting that the word "backyard" is widely used. In support of its summary judgment motion, Walmart conducted a state and federal trademark search, using Thompson CompuMark's Saegis® trademark database, which showed that, as of March 20, 2015, there were 527 active registered and pending marks that include the term "backyard." Of those marks, 23 included "grill" in the description of covered goods, and 22 included "barbeque." Additionally, a private investigator found at least 12 different businesses

15

that used the word "backyard."[4] If Variety's "Backyard" marks were "truly a distinctive term, it is unlikely that . . . many other businesses . . . would independently think of using the same mark or similar variants of it." *Grayson O*, 856 F.3d at 316. This case is therefore very analogous to *Grayson O*. Just as "450" and its variants are widely used within the haircare industry and lack conceptual strength, 856 F.3d at 315–16, the term "backyard" and its variants similarly are widely used in the grilling industry and lack conceptual strength.

ii.

Although we conclude that Variety's mark is conceptually weak, in certain circumstances, the commercial strength of a mark can be more important than the conceptual strength. *See Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*, 405 F. Supp. 2d 680, 690–91 (E.D. Va. 2005) (citing 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 11:83 (4th ed. 2005) [hereinafter McCarthy on Trademarks]). For example, marks such as "American Airlines" or "Kentucky Fried Chicken" may be conceptually weak, but these marks have formed a strong association with a particular source or product in consumers' minds. *Id.*; *see also CareFirst*, 434 F.3d at 269. "Conversely, even an inherently distinctive and strong . . . mark may have been strong at birth, but never realized its potential for fame and recognition in the

---

[4] These product names included were "Backyard Traditions," "Backyard Chef," "Backyard Bbq," "The BackyardKitchen," "Backyard Basics," "Backyard Feeds," "BackyardGardener.com," "Backyardcity.com," "Backyard Kitchen," Backyard Grill," "Backyard Paradise," and "The Backyard BBQ Grill Company." J.A. 479.

marketplace" and will not be deemed strong overall. McCarthy on Trademarks § 11:83. In sum, if a mark has sufficient commercial strength such that consumers would "associate the mark with a unique source," *Grayson O*, 856 F.3d at 315, it may be considered strong despite its conceptual weakness. We find that there is a genuine dispute as to whether Variety's marks are commercially strong, and we are therefore unable to determine the overall strength and distinctiveness of these marks.

We consider many factors to determine a mark's commercial strength: "(1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) sales success; (4) unsolicited media coverage of the product; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use." *Grayson O*, 856 F.3d at 316 (internal quotation marks omitted). Additionally, a court may consider whether "a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise." *CareFirst*, 434 F.3d at 269 (internal quotation marks omitted). Thus, "evidence of extensive third-party use also demonstrates that [a] mark lacks commercial strength . . . ." *Id.* at 270.

Here, both Variety and Walmart have produced sufficient evidence to put the commercial strength of Variety's marks in genuine dispute. On the one hand, Variety has produced some evidence of sales success, advertising expenditures, and duration of use of its marks that demonstrate commercial strength. *See Perini*, 915 F.2d at 125. Variety has sold over $56 million worth of products under its marks, with over $8 million from selling grills and grilling supplies. Although it does not specify how much was spent on

17

advertising, Variety has attested that it has spent "millions of dollars advertising and promoting its [Backyard] trademark on barbeque grills . . . ." Variety's Response/Reply Br. 34 n.12. Furthermore, there is evidence that Variety has used at least one of the variations of the marks since 1993. On the other hand, as discussed above, Walmart has produced evidence of extensive third-party use, which undermines the commercial strength of Variety's marks. *See CareFirst*, 434 F.3d at 270. Indeed, consumers may not "associate [the] mark with a unique source" if the word "backyard" is extensively used by the grill industry. *Grayson O*, 856 F.3d at 315. Thus, we conclude that the commercial strength of Variety's marks is genuinely disputed and a reasonable jury could resolve this issue in either party's favor. *See Reyazuddin*, 789 F.3d at 413.

In sum, when viewing the evidence in the light most favorable to Walmart, we conclude that the overall strength of Variety's marks is genuinely disputed. Because the commercial strength of Variety's marks is genuinely disputed, we find that the district court erred in weighing this factor in Variety's favor.

## B.

Next, considering Factor 2, the similarity of the marks, we find that there exists a genuine dispute of material fact as to whether the marks are similar. "[I]n evaluating the similarity of two marks, . . . the marks need only be sufficiently similar in appearance, with greater weight given to the dominant or salient portions of the marks." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 936 (4th Cir. 1995). "The dominant feature of a trademark is whatever is most noticeable in actual conditions." *Grayson O*, 856 F.3d at 317 (quoting 5 Callman on Unfair Competition, Trademarks &

18

Monopolies § 21:18 (4th ed. 2016) (emphasis omitted)). "Courts give the dominant part of a mark more weight when assessing similarity because consumers are more likely to confuse marks with dominant similar features than marks with less noticeable similar features." *Id.* Courts "need not engage in a technical dissection" of the marks, because consumers "typically do not engage in nuanced, piecemeal comparison of marks." *Id.* (citation omitted).

Here, reasonable minds may differ on whether they find Walmart's and Variety's marks similar so as to conclude there exists a likelihood of confusion between the two marks. On the one hand, Walmart's mark "Backyard Grill," like Variety's "Backyard BBQ," features the word "backyard" followed by another descriptive word. The similar linguistic design could confuse consumers; therefore, these two marks could be deemed sufficiently similar. On the other hand, Walmart argues that we should give greater weight to the word "grill" since, on the logo, it is larger and more noticeable than the word "backyard." Based on these two reasonable arguments, and viewing the evidence in the light most favorable to Walmart, we believe there exists a genuine dispute of material fact. Therefore, we conclude that the district court erred in finding this factor in Variety's favor.

C.

Turning to Factor 4, the similarity of the facilities used by the parties, we agree with the district court that this factor favors Variety. In examining this factor, we examine whether "the parties compete[] in a similar manner in overlapping markets," *George*, 575 F.3d at 397, or whether "there are basic differences between plaintiff's and

19

defendant's modes of distributing their products at these facilities," *CareFirst*, 434 F.3d at 273 (internal quotation marks omitted). Here, Variety and Walmart directly compete in similar manners in 17 jurisdictions. Both parties operate retail stores that carry a wide-ranging selection of outdoor products including grills and grilling supplies. Walmart's sole argument seems to be that since a consumer knows whether she is inside a Walmart store or a Variety store, it is unlikely that the consumer will confuse the stores and thus the marks. We are not persuaded by this argument and instead conclude that the facilities are similar because these two chains operate retail stores and directly compete in overlapping markets. *See id.*; *see also George*, 575 F.3d at 397.

D.

Turning to Factor 6, intent to confuse or infringe, we find that there exists a genuine dispute as to whether Walmart intended to confuse consumers by infringing on Variety's marks. "The intent of the defendant is sometimes a major factor in infringement cases." *Pizzeria Uno*, 747 F.2d at 1535. "If there is intent to confuse the buying public, this is strong evidence establishing likelihood of confusion, since one intending to profit from another's reputation attempts to make [similar marks] so as deliberately to induce confusion." *Id.*

The parties' arguments regarding Walmart's alleged intent to confuse consumers center around Dineen's deposition testimony. Dineen testified that Walmart's legal department advised the branding team not to adopt "Grill Works," "Backyard Barbeque," and "Backyard BBQ," and that Walmart did not investigate how Variety's stores were branding and marketing its products. In an affidavit following her deposition, Dineen

attested that Walmart's branding team knew Variety had adopted "The Backyard" for gardening supplies.

Viewing these facts in the light most favorable to Walmart, we conclude that there exists a genuine dispute as to whether Walmart intended to infringe. Dineen testified that Walmart knew about Variety's registration, which could support an intent to infringe. *See Star Indus, Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 389 (2d Cir. 2005) ("Bad faith may be inferred from the junior user's actual or constructive knowledge of the senior user's mark."). But that admission is tempered by the fact that the registration was only for "The Backyard," which covered gardening supplies but not grilling products, and Walmart claims that it did not know about Variety's use of "Backyard BBQ" on grills. Similarly, drawing inferences in Walmart's favor, Dineen's deposition testimony reveals that Walmart acted in good faith by following the advice of counsel to not adopt several other similar marks, including "Backyard Barbeque" and "Backyard BBQ." And although Walmart did not investigate how Variety's stores marketed their products, there is evidence suggesting that this omission was simply because Variety was not identified as a major competitor. Walmart's intent is therefore genuinely disputed, and the district court erred in weighing this factor in Variety's favor.

E.

Turning to Factor 7, actual confusion, we find that the district court applied the incorrect legal standard but nevertheless conclude that there exists a genuine dispute of material fact as to whether Walmart has affirmatively proved the lack of actual confusion. Although actual confusion is "often paramount," *Swatch AG v. Beehive Wholesale, LLC*,

739 F.3d 150, 162 (4th Cir. 2014) (quoting *CareFirst*, 434 F.3d at 268), "[i]t is well established that no actual confusion is required to prove a case of trademark infringement," *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 263 (4th Cir. 2007); *see also Super Duper, Inc. v. Mattel, Inc.*, 382 F. App'x 308, 313 (4th Cir. 2010) ("[T]he absence of such proof does not preclude a party from proving a likelihood of confusion based on a compilation of other evidence."). However, "the presence of actual confusion can be persuasive evidence relating to a likelihood of confusion," *Louis Vuitton*, 507 F.3d at 263, and, conversely, "the absence of any evidence of actual confusion over a substantial period of time . . . creates a strong inference that there is no likelihood of confusion," *CareFirst*, 434 F.3d at 269.

Here, the district court improperly weighed Walmart's evidence suggesting the lack of actual confusion. Although Variety did not produce any evidence of actual confusion, Walmart has attempted to affirmatively prove *the absence of* actual confusion by submitting consumer surveys. The district court, however, "fundamentally disagree[d] with the way the survey was conducted, and, thus, afford[ed] it relatively little weight." J.A. 1621. This was an error because, at the summary judgment phase, the district court should have "refrain[ed] from weigh[ing] the evidence." *Lee*, 863 F.3d at 327 (second alteration in original) (internal quotation marks omitted). The Supreme Court has made it clear that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are *jury* functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson*, 477 U.S. at 255 (emphasis added). For the purposes of ruling on Variety's

22

motion for summary judgment, "[t]he evidence of the non-movant [was] to be believed . . . ." *Id.* In subsequent proceedings, if Walmart's surveys carry any flaws identified by Variety, the jury—not the judge—must decide how much weight to place on them. *See id.* The district court erred in weighing this factor in Variety's favor.

F.

In sum, of the disputed factors, Factor 4 favors Variety. And because Walmart has not raised any arguments that the district court erred in weighing Factors 3, 5, 8, and 9 in favor of Variety, we consider them waived. *See Grayson O*, 856 F.3d at 316 ("A party waives an argument by failing to present it in its opening brief . . . ."). Our conclusion that Factors 1, 2, 6, and 7 are genuinely disputed, however, is significant because we have previously stated that Factors 1, 6, and 7 are often major factors in the likelihood of confusion analysis. *See id.* at 315 (the mark's strength); *Pizzeria Uno*, 747 F.2d at 1535 (intent to confuse); *Swatch AG*, 739 F.3d at 162 (actual confusion); *cf. George*, 575 F.3d at 400 ("[W]e are aware of no case where a court has allowed a trademark infringement action to proceed beyond summary judgment where two weak marks were dissimilar, there was no showing of a predatory intent, and the evidence of actual confusion was *de minimis*.)" Here, even if Factors 3, 4, 5, 8, and 9 favor Variety, because Factors 1, 2, 6, and 7 are genuinely disputed, we find that the ultimate question of likelihood of

23

confusion is also genuinely disputed.  Therefore, the district court erred in granting partial summary judgment in Variety's favor.[5]

We reiterate that "the likelihood of consumer confusion is an 'inherently factual' issue that depends on the unique facts and circumstances of each case." *Anheuser-Busch* 962 F.2d at 318 (quoting *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1356 n.5 (9th Cir. 1985)).  Whether Walmart's mark created a likelihood of confusion is indeed a question that the jury, consisting of ordinary consumers and using the nine factors as a guide, is well-suited to evaluate.

IV.

The district court's judgment entered on April 19, 2017, incorporates the district court's orders granting Variety's motion for partial summary judgment, denying Walmart's cross-motion for summary judgment, directing Walmart to disgorge its profit in the amount of approximately $32.5 million, and denying Variety's request for a jury trial for additional damages.  The district court's subsequent judgment entered on July 6, 2017, includes the order awarding Variety costs and attorneys' fees.

For the reasons stated above, we vacate the district court's order granting Variety's motion for partial summary judgment and affirm the order denying Walmart's motion for summary judgment.  We also vacate every order entered subsequent to the

---

[5] Because we find that the district court erred in its likelihood of confusion analysis, and this alone is sufficient to vacate the grant of summary judgment in Variety's favor, we need not address whether Variety's marks are protectable.

24

summary judgment rulings. The district court's disgorgement order and costs and fees order were heavily dependent on its summary judgment findings and stipulations. Therefore, with the summary judgment order vacated, these orders cannot stand. We also dismiss the parties' respective cross-appeals pertaining to disgorgement, denial of jury trial, and award of costs and fees because we vacate the underlying orders. We remand for further proceedings consistent with this opinion.

*DISMISSED IN PART,*
*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*