**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 23-2248**

WESTMONT LIVING, INC.,

Plaintiff - Appellant,

v.

RETIREMENT UNLIMITED, INC.; RICHMOND WSP, LLC,

Defendants - Appellees,

and

RUI MANAGEMENT SERVICES, LLC,

Defendant.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  Roderick Charles Young, District Judge.  (3:22-cv-00811-RCY)

Argued:  October 31, 2024                    Decided:  March 18, 2025

Before NIEMEYER, BENJAMIN, and BERNER, Circuit Judges.

Vacated and remanded by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Benjamin and Judge Berner joined.

**ARGUED:**  Celeste M. Butera, HOFFMAN & BARON, LLP, Syosset, New York, for Appellant.  Joshua Forrest Pescud Long, WOODS ROGERS VANDEVENTER BLACK,

PLC, Roanoke, Virginia, for Appellees. **ON BRIEF:** Benjamin White, IPLA, LLP, San Diego, California, for Appellant. Elaine D. McCafferty, Gavin Roe, WOODS ROGERS VANDEVENTER BLACK, PLC, Roanoke, Virginia, for Appellees.

NIEMEYER, Circuit Judge:

Westmont Living, Inc., a California corporation that operates 19 retirement communities and assisted living facilities in California and Oregon, markets nationally, soliciting and obtaining customers from across the country, including customers from the East Coast. It operates and markets its facilities using the mark "Westmont Living," for which it owns federally registered trademarks. It commenced this action against Retirement Unlimited, Inc. ("RUI"), a Virginia corporation that, at least as of September 2023, operated 26 retirement communities and assisted living facilities in Virginia, North Carolina, and Florida. It too markets nationally, soliciting potential customers throughout the country. In its complaint, Westmont Living alleged that RUI had opened a new facility outside of Richmond, Virginia, that it named "The Westmont at Short Pump" and that RUI's use of "Westmont" for the identical services that Westmont Living provides created a likelihood of confusion, in violation of the Lanham Act, 15 U.S.C. § 1114, and related laws. Westmont Living sought an injunction prohibiting RUI from using "Westmont," as well as damages.

On the parties' cross-motions for summary judgment, the district court entered judgment for RUI and against Westmont Living. While the court acknowledged that numerous factors are potentially relevant to determining the likelihood of confusion, it concluded, as a matter of law, that because the parties' physical facilities are located "in entirely distinct geographic markets," "consumer confusion [was] impossible." It found "dispositive" the Second Circuit's decision in *Dawn Donut Co. v. Hart's Food Stores, Inc.*,

3

where the court held that when the parties use their marks in separate and distinct markets, there can be no likelihood of confusion.  267 F.2d 358, 364–65 (2d Cir. 1959).

Because the district court did not address the parties' competitive marketing, the locations from which they solicit and draw their customers, the scope of their reputations, or, for that matter, any of the nine factors that we have identified for determining the likelihood of confusion, *see RXD Media, LLC v. IP Application Dev. LLC*, 986 F.3d 361, 373 (4th Cir. 2021), we vacate its judgment.  The court erred by relying *solely* on the fact that the parties' physical facilities were on opposite coasts, without considering the numerous other factors that might bear on whether Westmont Living has shown a likelihood of confusion.  Accordingly, we remand for consideration of the various factors that may be relevant to the issue in light of the circumstances presented.

I

Westmont Living provides retirement housing, assisted living services, and memory care services at 17 facilities in California and 2 facilities in Oregon, and it plans to open 2 more facilities in California.  Since its launch in 2008, the company has used a trademark in connection with its services that has the words "Westmont Living" under a stylized drawing of two trees, and in 2009 and 2010, it obtained federal registrations for that mark in connection with various types of senior living facilities and services.  As part of its effort to build its brand and reputation, the company has consistently named its facilities using the word "Westmont" and a descriptor of the facility's location — for example, Westmont at San Miguel Ranch and Westmont of Riverside.  According to Westmont Living's

4

president, "This 'trademark plus location' naming convention is common in the industry." He noted, for example, that one of Westmont Living's largest competitors, Sunrise Senior Living, uses the same naming convention and has locations across the country, including Sunrise of Richmond in Richmond, Virginia. Westmont Living acknowledges that it has no current plans to expand to the East Coast, although it has, from time to time, considered doing so, even taking concrete steps toward that goal.

Westmont Living markets its facilities nationally, using the "Westmont Living" mark, and it spends millions of dollars annually on its comprehensive marketing efforts. It maintains a corporate website, http://westmontliving.com, where potential customers and their family members can learn about its facilities and services, and each facility also has its own webpage. It also advertises on a number of specific platforms, including Facebook, LinkedIn, Instagram, Twitter, Google, and Bing, with the "main goal of funneling all online traffic to [its own] website." Similarly, it has purchased a Google business page that allows it to feature more prominently in Google search results. Finally, it lists its facilities on third-party referral sites, such as "A Place for Mom."

Consistent with its marketing effort, Westmont Living draws customers from all over the United States. As the president of Westmont Living explained, customers who are ready for retirement often "relocate from all over the country for different reasons including moving closer to friends, family, and to desirable destinations." He noted also that "[t]he senior living purchasing decision . . . is often made in conjunction with input and support from family members who may live in other states than the prospective resident." In particular, adult children are often actively involved in the decision and may

want their parents to move closer to be able to spend more time together and assist with their care. Moreover, the vitally important decision of selecting a senior living facility is "typically initiated by an online search." In fact, Westmont Living has cited a report indicating that "75% of senior respondents are using search engines to find more information on senior living, most commonly Google." Thus, because the potential customer base is national in scope and can be reached online, Westmont Living's online marketing is also national in scope and is not limited to any particular geographic region.

Westmont Living has demonstrated that, in response to its marketing efforts, "[t]ens of thousands" of people from across the country, including *from every State* in the nation, have visited its website. More specifically, Westmont Living's website has registered over 9,000 visits from Virginia, 4,400 from Florida, and 2,000 from North Carolina — the States where RUI's facilities are located. Moreover, customers from those States have moved into Westmont Living's facilities, including "at least" 20 from Virginia, 35 from Florida, and 13 from North Carolina, generating millions of dollars in revenue. Westmont Living's president noted that the success of its marketing program is attributable not only to its facilities but also to its positive reputation, pointing to reviews provided by third parties and its receipt of various awards, including a "2023 A Place for Mom Best of Senior Living Award" and the "2023 Pinnacle Customer Experience Award." According to him, "The senior living purchasing decision is largely driven by reputation and reviews," such that "Westmont's brand, reputation, and goodwill . . . are crucial to its success."

RUI is in the same business as Westmont Living, providing retirement housing, assisted living services, and memory care services at apparently at least 26 locations in

6

Virginia, North Carolina, and Florida. It generally names each facility with a geographic descriptor, combining a nearby street or area with its location. In 2018, it began taking steps to build a new facility outside of Richmond, Virginia, which it named "The Westmont at Short Pump," combining the name of a "nearby affluent neighborhood in the West End of Richmond (Westmont-Pineview) with its location (Short Pump)." And today, the facility operates under that name.

Soon after selecting the "Westmont at Short Pump" name, RUI designed a logo with that name appearing under a stylized "W" and filed a trademark application for that mark, stating that it sought to use it in connection with "[r]etirement communities for seniors providing independent living facilities, assisted living facilities and memory care facilities." The U.S. Patent and Trademark Office, however, refused to register the mark, citing a "likelihood of confusion" with Westmont Living's registered marks. Nonetheless, RUI decided to proceed with the use of the "Westmont" name for its new facility.

Like Westmont Living, RUI markets its facilities nationally on the Internet, and its website also receives tens of thousands of visits a year, with "hits" from every State. Its top three States by number of hits are Virginia, Florida, and Maryland, with California 7th and Oregon 24th.

Westmont Living presented evidence showing that when customers search on Google for "Westmont Living," its site is listed at the top of the results but appears directly adjacent to RUI's Google business page for its "Westmont at Short Pump" facility. Similarly, when customers search for "Westmont Living Retirement" or "Westmont Living Senior Living," again, Westmont Living's website is the first non-sponsored result, but it

7

appears on the same page and adjacent to RUI's Google business page for "The Westmont at Short Pump." Also, when a customer searches the third-party site "A Place for Mom" by using "Westmont Living," the "Westmont at Short Pump" facility appears *first* followed by Westmont Living's facilities.

Westmont Living also hired an expert to conduct a consumer survey to test whether there was consumer confusion based on RUI's use of "The Westmont at Short Pump." The expert found that 43.6% of respondents who were shown both Westmont Living's trademark and RUI's "Westmont at Short Pump" logo stated that they believed that the latter was from the same organization as Westmont Living. Of those respondents, 67.3% said it was because "The Westmont at Short Pump" had "the same name" or because it "had Westmont in the name." Further, 72.8% of respondents said that they believed "The Westmont at Short Pump" was associated or affiliated with "Westmont Living."

In July 2020, Westmont Living sent RUI a cease-and-desist letter, maintaining that consumers were likely "to erroneously believe that RUI's retirement community services [were] sponsored, endorsed by, or associated with Westmont [Living]" and advising that it thus considered RUI's use of the word "Westmont" "in connection with identical retirement community home services" to be an infringement of its "registered and common law rights." Following RUI's refusal to accommodate Westmont Living's demand, Westmont Living commenced this action in December 2022 against RUI and an affiliated

8

company,[*] alleging federal claims for trademark infringement and unfair competition under the Lanham Act, as well as claims for trademark infringement and unfair competition under Virginia law. It alleged, specifically, that "consumers searching the internet for Westmont are likely to be confused as to the source and affiliation between" Westmont Living and "The Westmont at Short Pump." For relief, Westmont Living sought an injunction, as well as compensatory and punitive damages.

On the parties' cross-motions for summary judgment, the district court granted RUI's motion and denied Westmont Living's. While the district court concluded that Westmont Living owned valid and protectable trademarks, a fact that RUI has not disputed, the court concluded that the geographic separation between the parties' physical facilities — with The Westmont at Short Pump in Virginia and all of Westmont Living's facilities in California and Oregon — precluded a finding a consumer confusion. The court relied on *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358 (2d Cir. 1959), a decision that it characterized as "stand[ing] for the proposition that, where the parties operate in separate and distinct markets, there can be no likelihood of confusion," such that no remedy is warranted "so long as the senior trademark user possesses no imminent plans to expand into the infringer's territory." The court thus concluded that "consumer confusion [was] impossible." Accordingly, it entered final judgment in favor of RUI.

---

[*] Westmont Living originally named an affiliated company, RUI Management Services, LLC, as a defendant along with RUI, but in September 2023, the district court granted the parties' joint motion to substitute Richmond WSP, LLC for the affiliate. Like the parties, we refer to the defendants collectively as "RUI."

From the district court's judgment dated November 3, 2023, Westmont Living filed this appeal.

II

Because a trademark identifies and distinguishes the owner's goods and services, as well as their source, it is valuable to the owner's business. *See Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 146–47 (2023). Confusion or even a likelihood of confusion created by an infringement of the owner's mark deprives the owner of the benefits of the mark, including hard-won goodwill. It also deprives the public of the ability to distinguish a company's goods and services from those of a competitor. In short, trademark infringement involves the theft and appropriation of someone else's goodwill and the deception of the public. *See id.* at 147. ("Confusion as to source is the bête noire of trademark law — the thing that stands directly opposed to the law's twin goals of facilitating consumers' choice and protecting producers' good will").

To establish a claim under the Lanham Act, the plaintiff must demonstrate a likelihood of confusion. 15 U.S.C. § 1114. But in this case, the district court held that it was "impossible" for Westmont Living to show a likelihood of confusion because "the geographic separation between the parties' trade territories preclude[d] a finding of consumer confusion," relying on *Dawn Donut*, 267 F.2d at 365.

Westmont Living contends that the district court erred in its ruling by failing to apply the nine factors that we have established as relevant in determining a likelihood of confusion for trademark infringement and that the court instead erroneously "exalted

10

'geographic location' of the parties' senior living facilities as the *only* inquiry for determining likelihood of confusion." (Emphasis added). The court, it maintains, failed to account for the fact that "[b]oth Westmont and RUI market and sell their retirement living services throughout the country on the internet," such that "customers searching on the internet for the services that both parties are engaged in *are* likely to become confused when they encounter" both marks. (Emphasis added). Thus, it argues, "[t]he District Court's reliance on *Dawn Donut* [was] misplaced," and "[w]hen the *relevant* factors established by this Court for determining likelihood of confusion are properly examined in this case, it is clear that a strong case of likelihood of confusion exists," either warranting summary judgment in its favor on the issue of liability or, at the very least, a jury trial.

RUI argues that the district court correctly determined that "the *Dawn Donut* rule applies and precludes likelihood of confusion or any remedy based on the undisputed evidence of geographic remoteness between the parties" and the lack of evidence that Westmont Living has any plans to enter the Virginia market, where RUI uses the "Westmont" name. It contends that under the holding of *Dawn Donut*, the parties' "geographic remoteness eliminates the possibility of consumer confusion," rendering "the factors that are traditionally considered" irrelevant. It asserts that this rule has been "consistently applied" in our court and others "in the context of service industries that depend on physical presence as opposed to goods sold nationally or over the internet," and it argues that we should reject Westmont Living's "attempt[] to manufacture" a "national market presence" based on consumers' "access to its internet marketing materials." Finally, RUI argues that even if *Dawn Donut* were not dispositive, it would still be entitled

11

to summary judgment when the nine factors for determining likelihood of confusion are considered.

The core issue thus presented is whether the district court erred in holding that the *Dawn Donut* rule was dispositive of the issue of likelihood of confusion in the circumstances presented by this case.

It is well established that to prove trademark infringement under the Lanham Act, 15 U.S.C. § 1114, the plaintiff "must show both (1) 'that it owns a valid and protectable mark,' and (2) 'that the defendant's use of a "reproduction, counterfeit, copy, or colorable imitation" of that mark creates a likelihood of confusion.'" *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 660 (4th Cir. 2018) (quoting *CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 267 (4th Cir. 2006)). The same showing is also required for proving an unfair competition claim under the Lanham Act, as well as the Virginia common law and statutory claims alleged. *See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 930 & n.10 (4th Cir. 1995). Here, there is no dispute that Westmont Living owns a valid and protectable mark, as evidenced by its federal trademark registrations, and therefore the only question left is whether Westmont Living has presented evidence that RUI's use of "Westmont" is likely to cause confusion with Westmont Living's mark.

Trademark law protects trademarks from a *likelihood* of confusion caused by an infringing mark regardless of whether *actual* confusion was caused and regardless of whether those likely to be confused were *actual* customers or only *potential* customers. *See* 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:5, at

12

23-43 to 23-44, § 23:12, at 23-116 (4th ed. 2012).  And the trademark owner need not show that the likelihood of confusion caused any actual loss of sales.  *Id.* § 23:5, at 23-45; *see also Commc'ns Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245, 1250, 1252 (4th Cir. 1970).  Moreover, an actionable likelihood of confusion can relate "not only as to source, but also as to affiliation, connection or sponsorship."  4 McCarthy, *supra*, § 23:8, at 23-66; *see also Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1121 (6th Cir. 1996) (explaining that it was "not particularly significant" that golfers were unlikely to be confused about which course they were playing on, as the "relevant question" was whether a golfer "would likely be confused about affiliation between the two clubs").  "The fact that neither geographically nor in size or cost of service are the parties directly in competition does not preclude the relief sought" for a likelihood of confusion.  *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 613 (7th Cir. 1965).

Recognizing this scope of a trademark's use, we have identified nine factors for determining whether an allegedly infringing mark is likely to cause confusion:

> (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of the advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public.

*RXD Media, LLC v. IP Application Dev. LLC*, 986 F.3d 361, 373 (4th Cir. 2021) (quoting *Variety Stores*, 888 F.3d at 660); *see also, e.g., Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 314 (4th Cir. 2017); *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 153

13

(4th Cir. 2012). We have made clear, however, that "[n]ot all of these factors will be relevant in every trademark dispute, and there is no need for each factor to support [the plaintiff's] position on the likelihood of confusion issue." *Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 171 (4th Cir. 2006). In other words, these factors "are not meant to be a rigid formula" but rather "a catalog of various considerations that may be relevant in determining the ultimate statutory question of likelihood of confusion." *Variety Stores*, 888 F.3d at 660 (quoting *Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 320 (4th Cir. 1992)).

We have also recognized that embedded in those factors is a consideration of "the similarity in scope of the parties' geographic markets" and "the area and manner of concurrent use" of the marks. *What-A-Burger of Va., Inc. v. Whataburger, Inc. of Corpus Christi*, 357 F.3d 441, 450 (4th Cir. 2004) (cleaned up). But in considering geographic markets, we made clear that the analysis does not "begin and end with geographical territories, particularly when the reputation of the senior user's mark has been carried into a trade area prior to the junior user's adoption and use." *Id.* at 450 n.7 (cleaned up). In *Pizzeria Uno Corp. v. Temple*, for instance, in analyzing the similarity of advertising factor — factor (5) above — we observed that while the parties used the same media, they advertised in different areas. 747 F.2d 1522, 1535 (4th Cir. 1984). Therefore, "[g]iven the present unlikelihood of geographic overlap in advertisements," we concluded that the factor was not of "decisive importance." *Id.* But we have never held, as did the district court in this case, that "when there is no likelihood that the senior federal registrant will expand their use, the geographic separation between the two uses renders consumer

14

confusion impossible." And, indeed, it is almost universally established that it is *not* necessary for the infringer to be located in the same geographic market as the mark's owner or indeed even to be in competition with the mark's owner. The *McCarthy* treatise, on which the district court purported to rely, states:

> Just as it is not necessary for trademark infringement or unfair competition that the goods or services of the parties be in actual competition, so also it is not necessary that the goods or services of the parties be in direct competition *in the same geographical market.*
>
> *Mere geographical distance is not controlling* where the reputation of the senior user's mark has been carried into a trade area prior to the junior user's adoption and use. Modern advertising media lend credence to applying the truism, "It's a small world."

5 McCarthy, *supra*, § 26:18, at 26-28 (emphasis added). *McCarthy* then provides pages of examples where a likelihood of confusion was found because the plaintiff's mark was known by reputation, even though the businesses were located in different geographical markets, such as, for example: the Americana Hotel in New York City, Miami Beach, and Puerto Rico infringed by the Americana Inn in Chicago, *see Tisch Hotels*, 350 F.2d 609; the Brass Rail restaurant in New York City infringed by Brass Rail restaurants in Boston, *see Brass Rail, Inc. v. Ye Brass Rail of Mass., Inc.*, 43 F. Supp. 671 (D. Mass 1938); Caesar's Palace in Las Vegas infringed by Caesar's Palace Coiffures, a small beauty salon in New Jersey, *see Caesars World, Inc. v. Caesar's Palace*, 490 F. Supp. 818 (D.N.J. 1980); the Pump Room restaurant in Chicago likely infringed by a Pump Room restaurant in New York City, *see Ambassador East, Inc. v. Shelton Corners, Inc.*, 120 F. Supp. 551 (S.D.N.Y. 1954); the Ritz Carlton hotel in New York and Boston infringed by a Ritz Carlton hotel in Miami Beach, *see Ritz Carlton Hotel Co. v. Ritz Carlton Hotel Corp.*,

15

66 F. Supp. 720 (S.D. Fla. 1946); The Stork Club in New York City infringed by a Stork Club tavern in San Francisco, *see Stork Rest. v. Sahati*, 166 F.2d 348 (9th Cir. 1948). *See* 5 McCarthy, *supra*, § 26:19, at 26-29 to 26-32. The *McCarthy* treatise also explains that "[t]he territorial scope of a trademark and its good will must be defined in terms of the area *from which customers are drawn*, *the coverage of advertising media* and the nature of the goods or services sold." *Id.* § 26:27, at 26-44 (emphasis added). It went on to explain that the territorial scope of a mark is referred to "as a series of 'zones,' with zones of sales, advertising, reputation and expansion." *Id.* at 26-45.

The district court, however, never considered anything but the location of the parties' physical facilities where the parties provide their services and thereby relied mechanically on *Dawn Donut*. In doing so, it failed to take into account all the relevant facts bearing on the territorial scope of a registered mark and the zones in which a likelihood of confusion can be caused, such as the areas from which customers are drawn, where advertising is conducted, and where reputation extends.

*Dawn Donut* stands for a narrow and logical principle that where businesses use the same mark in physically distinct geographical markets and their marketing and advertising are confined to those geographical markets, a likelihood of confusion will not be created. In *Dawn Donut*, the plaintiff, Dawn Donut Company, manufactured mixes for baked goods in Michigan, which it sold to bakeries in various States, along with the right for some of those bakeries to sell baked goods under Dawn Donut's registered trademark, "Dawn." 267 F.2d at 361. The company shipped its mixes from Michigan directly to customers in New York, including bakeries in Rochester, but no bakeries in Rochester or within 60 miles

16

of Rochester were licensed to use the plaintiff's "Dawn" mark. *Id*. The defendant operated a grocery chain in the Rochester area and also used the mark "Dawn" in connection with its retail sales of baked goods. The defendant, however, did not conduct any advertising beyond its distinct geographical area. *Id.* Moreover, because Dawn Donut had neither advertised nor authorized the use of its mark for any retail sales in the defendant's geographical area for "about thirty years," the court concluded that it was unlikely that Dawn Donut would expand into the defendant's geographic area of operation. *Id.* at 364–65. The court thus held:

> Accordingly, because plaintiff and defendant use the mark in connection with retail sales in distinct and separate markets and because there is no present prospect that plaintiff will expand its use of the mark at the retail level into defendant's trading area, we conclude that there is no likelihood of public confusion arising from the concurrent use of the marks and therefore the issuance of an injunction is not warranted.

*Id*. at 365. The court cautioned, however, that should Dawn Donut in the future establish "an intent to use the mark at the retail level in defendant's market area," it *might* then "be entitled to enjoin defendant's use of the mark." *Id*.

We recognized the simple logic and limited scope of *Dawn Donut*'s holding in *What-A-Burger*, although we did not cite the case. 357 F.3d 441. In *What-A-Burger*, a Texas-based hamburger restaurant chain, operating in Texas and several Southern states, was using the mark "WHATABURGER," while a Virginia corporation operated "What-A-Burger" restaurants solely in Virginia. *Id.* at 444–45. We recognized that the Texas company could not enjoin the Virginia one from operating under the name "What-A-Burger" in Virginia. *Id.* at 451. The parties there operated distinctly and without confusion

for nearly 50 years. Indeed, for more than 10 years, the Texas corporation did not even know of the Virginia operation's existence. *Id.* at 444–45. In those circumstances, we reasoned, unremarkably:

> The fact that Texas WAB and Virginia W-A-B operate in separate territorial markets — and that Texas WAB professes no plans to enter the Virginia market — raises significant doubt that Virginia W-A-B's use of the mark creates the "likelihood of confusion" required for infringement.

*Id.* at 450. We also added that we did not "mean to suggest that the likelihood of confusion analysis begins and ends with geographical territories, particularly when the reputation of the senior user's mark has been carried into a trade area prior to the junior user's adoption and use, *which is not uncommon in cyberspace.*" *Id.* at 450 n.7 (emphasis added) (cleaned up).

Thus, both *Dawn Donut* and *What-A-Burger* recognize the commonsense proposition that when two local businesses operate with the same mark in entirely distinct geographical markets, including their advertising and marketing, a likelihood of confusion will not arise. But those circumstances are present far less frequently today, in light of increased mobility, the Internet, and the reduced influence of local radio and newspaper advertising. *See Cir. City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1057 (6th Cir. 1999) (Jones, J., concurring) (observing that "[t]he *Dawn Donut* Rule was enunciated in 1959" and that "our society is far more mobile than it was four decades ago," with "the Internet . . . increasingly deconstructing geographical barriers for marketing purposes").

More importantly, the holdings in those cases have no play in the circumstances presented in the record before us. While Westmont Living operates facilities on the West

18

Coast and RUI operates facilities on the East Coast, they both advertise nationally, and with good success. Westmont Living's online advertising has produced tens of thousands of affirmative responses, including inquiries *from every State*, which have yielded numerous customers and contributed millions of dollars to Westmont Living's gross revenue. RUI likewise advertises nationally on the Internet, and presumably also with good results. Thus, when a person searches the Internet for "Westmont," he or she will encounter both Westmont Living's site and RUI's site for The Westmont at Short Pump. The circumstances here are not unlike those presented in the numerous cases listed in the *McCarthy* treatise, where businesses owned facilities in distinct geographical areas but yet their marketing and reputation gave rise to at least the possibility of a likelihood of confusion. As noted, an inquiry into the likelihood of confusion explores the responses by customers and potential customers, *wherever found,* to the parties' marketing. *See* 4 McCarthy, *supra*, § 23:5, at 23-43 to 23-44 ("At issue in most cases is the likely confusion of members of the relevant class of customers and potential customers . . . who might some day purchase this kind of product or service and [who] pay[] attention to brands in that market"). And a likelihood of confusion can arise in relation not only to a product or service's source but also affiliation, connection, or sponsorship, with serious stakes for a company's reputation and goodwill. *See* 4 McCarthy, *supra*, § 23:8, at 23-66. Moreover, confusion is more likely when the plaintiff and the defendant compete with *the identical service* and the *identical name*, as the parties do here. In those circumstances, it may be most difficult for a casual consumer to distinguish the two companies when engaging in

19

online research for retirement living, and the physical distance of the parties' facilities does not eliminate that risk.

Thus, we conclude that the district court's reliance on only the geographical distance between the physical facilities of the two companies was simply too narrow an approach for this case. Were that approach appropriate, a developer could build a "Disney World" in Wheaton, Illinois, without infringing the marks of the real "Disney World" in Orlando, Florida. Such surely cannot be the case.

We vacate the district court's judgment and remand for further proceedings to consider the relevant factors for determining a likelihood of confusion.

VACATED AND REMANDED