UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

GARY PEEPLES,

*Plaintiff-Appellant,*

v.

COASTAL OFFICE PRODUCTS,
INCORPORATED,

*Defendant-Appellee.*

No. 02-1848

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Andre M. Davis, District Judge.
(CA-01-1241-AMD)

Argued: April 4, 2003

Decided: May 7, 2003

Before WIDENER, WILKINSON, and MOTZ, Circuit Judges.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Paul Francis Evelius, WRIGHT, CONSTABLE &
SKEEN, L.L.P., Baltimore, Maryland, for Appellant. Darrell Robert
VanDeusen, KOLLMAN & SAUCIER, P.A., Baltimore, Maryland,
for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

Plaintiff Gary Peeples alleged that he was fired in violation of the Family Medical Leave Act (FMLA) when he took more then three weeks off of work to deal with feelings of depression and anxiety. His employer Coastal Office Products, Inc., asserts that Peeples failed to comply with the terms of the Act and left them with no choice but to terminate his employment. The FMLA creates a scheme which balances an employee's need for leave with his employer's need to plan for staffing shortages and workplace demands. Peeples failed to work within the FMLA framework and to meet his burden of providing sufficient information to Coastal. We thus affirm the judgment of the district court and dismiss Peeples' claims.

I.

Peeples was employed by Coastal Office Products, Inc., a small computer services company, from April 1995 until April 2000. He began his career with Coastal as a service technician and was eventually promoted to Assistant Hardware Services Manager and, in late January 2000, to Hardware Services Manager. Hardware Services is Coastal's largest and busiest department and Peeples was given a substantial pay increase when he assumed the manager position.

Almost immediately upon becoming Hardware Services Manager, Peeples began to feel anxious about the job and all of his new responsibilities. By early March, Peeples felt overwhelmed by the work and began experiencing symptoms of depression and anxiety. On March 10, he left work early complaining that he felt ill. Peeples did not return to Coastal after this date.

After leaving the office on March 10, Peeples went to the emergency room at Carroll County General Hospital where he underwent

a psychiatric consultation. Peeples was discharged that day with instructions and a note specifying that he was not to return to work for a week. Under the heading marked "restrictions," the note said "none." Peeples faxed this note to his boss Matt Ziskind on Monday, March 13.

On March 17, Peeples saw his primary care physician Dr. Randi Braman. Following this appointment, Dr. Braman faxed Ziskind a "Sick Slip" stating that Peeples "needs follow-up appointments [and] medication adjustment — not yet ready to resume work." Peeples also called Ziskind telling him he still needed time off, but he did not specify why.

Later that week, Ziskind called Peeples and inquired as to how he was doing. Peeples told Ziskind that he would have no further information until he saw a thyroid doctor. Peeples did not mention to Ziskind that he would be seeing a psychologist the next day and gave Ziskind no information as to what, if any, medical condition he might be suffering from. During this time, Ziskind was performing both his own job tasks and the tasks Peeples would have been performing as Hardware Services Manager.

On Monday, March 27, Ziskind e-mailed Peeples to explore whether Peeples might be able to perform some of his job functions from home. Peeples initially failed to respond to this inquiry at all, and when Ziskind followed up, responded that he would be unable to do any work from home. Peeples also reported that he had upcoming appointments with a sleep specialist and a thyroid specialist, and reiterated that he did not know when he might return to work. He did not tell Ziskind that he was suffering from anxiety due to the stress of his new job.

Unsure how to proceed, Ziskind then contacted Coastal's Human Resources Director Kimberly Hock to see about potential alternate coverage for Peeples' position. On Thursday, March 30, Hock spoke to Peeples by telephone to determine the extent of Peeples' restrictions and whether there was any sort of work that he could do for Coastal at that time. Peeples told Hock that he did not know when he would be able to return to work, that he could do nothing related to his job, and that he was "leaning toward" not returning to Coastal as

a manager. At the end of the conversation, Hock asked Peeples to keep her informed as to his condition and status. At no time during their conversation did Peeples mention to Hock that he was suffering from depression.

Coastal's COO Harold Clasing sent an e-mail to Peeples on April 3, 2000, again trying to assess whether Peeples planned or would be able to return to work. In the e-mail, Clasing requested a conference call with Peeples and Dr. Braman. Peeples declined to be involved in the call, but he gave Clasing permission to speak to Dr. Braman, which Clasing did on April 4. Braman told Clasing that she had been seeing Peeples for "agitation, insomnia, anxiety and some [symptoms] of depression." Clasing asked Dr. Braman if there were any general or specific restrictions on Peeples' ability to work. Dr. Braman responded that there were none, but that Peeples could not work at Coastal. Based on this conversation, Clasing determined that Peeples had abandoned his job and that there was no likelihood of his returning to work at Coastal. Clasing, on behalf of Coastal, informed Peeples of his termination on April 5, 2000, by e-mail and letter.

On April 25, Peeples filed a charge of disability discrimination with the EEOC. Peeples also filed a complaint with the U.S. Department of Labor alleging that Coastal failed to provide him with FMLA leave. Peeples then brought this action against Coastal alleging that the company discharged him in violation of the FMLA and ADA. After the filing of cross-motions for summary judgment, the district court denied both plaintiff's and defendant's motions for summary judgment on the FMLA claims, but granted summary judgment for Coastal on the ADA claims.[1] On May 22, 2002, the district court granted summary judgment to defendant as to all remaining claims and denied plaintiff's motion for recusal.[2] *See Peeples v. Coastal*

---

[1]We agree with the district court that Peeples' claims under the ADA are wholly without merit. There is no evidence in the record that Peeples was substantially limited in performing a major life activity or that Coastal perceived him as such. Moreover, Peeples' retaliation claim fails because the record reveals that he was not engaged in a protected activity.

[2]We likewise see no basis for the district court's recusal.

*Office Prods., Inc.*, 203 F. Supp. 2d 432 (D. Md. 2002). Peeples appeals.

## II.

Peeples argues that as a matter of law he was on FMLA leave from March 10, 2000, until April 5, 2000, because he was suffering from a "serious health condition," namely depression. The FMLA allows an employee with "a serious health condition that makes the employee unable to perform the functions of the position of such employee" to take up to 12 weeks of unpaid leave. 29 U.S.C. § 2612(a)(1)(D). An employee who takes such leave must be restored to his former position upon return from leave. 29 U.S.C. § 2614(a)(1). Before an employer's duty to provide leave is triggered, however, an employee must provide "adequate" and "timely" notice of the need for covered leave. *Carter v. Ford Motor Co.*, 121 F.3d 1146, 1148 (8th Cir. 1997).

Although an employee need not specifically mention the FMLA in requesting leave, employers "are entitled to the sort of notice that will inform them not only that the FMLA may apply but also when a given employee will return to work." *Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1008 (7th Cir. 2001). Because the FMLA was designed to "balance the demands of the workplace with the needs of families," employers and employees are encouraged to communicate with each other in an interactive process that helps each party fulfill its needs. 29 U.S.C. § 2601(b)(1). Thus, "the FMLA presupposes that employers and employees will cooperate and exchange information." *Peeples*, 203 F. Supp. 2d at 447-48.

To this end, the FMLA regulations encourage employers to gain the information they need to make an FMLA assessment through both informal and formal means. *See* 29 C.F.R. § 825.303. In accord with these regulations, Coastal tried repeatedly to solicit information from Peeples in order to assess his needs. However, Peeples refused to provide any information that might have triggered Coastal's duties under the FMLA. Indeed, Peeples was deliberately evasive and misled his employer as to his true condition.

The only information provided by Peeples to Coastal at the outset of his long absence was an emergency room slip stating that he was

under no restrictions. *Peeples*, 203 F. Supp. 2d at 440. Over the next week, Ziskind struggled to handle both his own responsibilities and Peeples' responsibilities as manager of the company's largest and busiest department. During this time, Ziskind received only a phone call from Peeples indicating that he hoped to return to work the following week and a note from Dr. Braman stating that Peeples was "not yet ready to resume work." *Id.* at 441.

In the ensuing weeks, Coastal continued its attempts to get a clear picture of Peeples' status and needs. Each time he was contacted, however, Peeples gave only the vaguest statements about his diagnosis and possible return date. In his conversations with both Ziskind and Kim Hock, Peeples falsely indicated that his medical condition was related to a thyroid disorder. At no time did either Peeples or his physician advise Ziskind, or anyone else at Coastal, that Peeples was suffering from a psychiatric condition.

At the point when Harold Clasing became involved, Peeples had been away from the office for three weeks with no explanation for his absence or prognosis for his return. Despite this, Clasing tried in earnest to contact Peeples once again in order to gain an understanding of his condition. Peeples agreed to let Clasing speak with his physician, but "declined to participate in the call and therefore abjured any opportunity to ensure that there was no miscommunication between his employer and his doctor." *Peeples*, 203 F. Supp. 2d at 454. During the ensuing phone call with Dr. Braman, the physician did not reveal that Peeples was seeing a psychiatrist or that he could be expected to return to work within a few weeks, but instead stated only that Peeples' mental condition made him unable to work at Coastal.

It is clear from the record that Coastal "was utterly incapable of making a preliminary determination as to whether Peeples' absence was justified . . . because Peeples and his doctor were providing incomplete responses, indeed, dishonest responses, to defendant's informal requests for information." *Id.* (emphasis omitted). In such a situation, when "notice of a possible serious medical condition is deliberately withheld and false information is given, it cannot be said that an employee has been terminated in violation of the FMLA." *Gay v. Gilman Paper Co.*, 125 F.3d 1432, 1436 (11th Cir. 1997). Peeples did not satisfy the threshold requirements of the FMLA to provide

Coastal with the information necessary to trigger its duties and obligations under the Act. Based on the limited information provided to it, Coastal "not unreasonably determined, in good faith . . . that Peeples was not going to return to the manager's job." *Peeples*, 203 F. Supp. 2d at 455 (emphasis omitted). Therefore, Peeples termination did not violate the FMLA.

## III.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.