**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 20-2202**

———————————

KASEY A. ROBERTS,

    Plaintiff − Appellant,

    v.

GESTAMP WEST VIRGINIA, LLC,

    Defendant – Appellee.

———————————

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston.  Irene C. Berger, District Judge.  (2:19−cv−00854)

———————————

Argued:  May 3, 2022                    Decided:  August 15, 2022

———————————

Before DIAZ, RUSHING, and HEYTENS, Circuit Judges.

———————————

Affirmed in part, vacated in part, and remanded by published opinion.  Judge Diaz wrote the opinion, in which Judge Rushing and Judge Heytens joined.

———————————

**ARGUED:**  Richard William Walters, SHAFFER & SHAFFER, PLLC, Charleston, West Virginia, for Appellant.  Eddie Travis Ramey, BURR & FORMAN LLP, Birmingham, Alabama, for Appellee.  **ON BRIEF:**  Carl W. Shaffer, SHAFFER & SHAFFER, PLLC, Charleston, West Virginia, for Appellant.  Wm. Grayson Lambert, BURR & FORMAN LLP, Columbia, South Carolina, for Appellee.

———————————

DIAZ, Circuit Judge:

Kasey Roberts appeals the district court's grant of summary judgment to his former employer, Gestamp West Virginia, LLC, on his Family & Medical Leave Act ("FMLA") and common law retaliatory-discharge claims. Gestamp fired Roberts after he missed work due to a recurring infection from an emergency appendectomy. The district court granted Gestamp's summary judgment motion because Roberts, it said, didn't comply with the company's "usual and customary" absentee notice procedures, as the FMLA requires. 29 C.F.R. § 825.303(c). And Roberts's common law claims failed because he hadn't shown an FMLA violation.

On appeal, Roberts contends the district court erred because, through his dealings with Gestamp, the company's "usual and customary" notice procedures for leaves of absence expanded beyond those in its written policy. And Roberts argues that he complied with his FMLA obligations by notifying Gestamp of his absences over Facebook Messenger, which the company had previously accepted. We agree with Roberts's reading of the FMLA regulations and find that he's raised a jury question on whether using Facebook Messenger satisfied the Act's requirements.

But Gestamp counters that even if Roberts's initial notice were adequate, he neglected his FMLA obligation to update the company on the duration of his absence, defeating his FMLA-interference claim. On this too, Roberts has raised a material factual dispute to survive summary judgment. So we vacate the district court's judgment on his interference claim and remand.

2

That said, we agree with Gestamp that the district court properly granted judgment against Roberts's FMLA-retaliation and common law retaliatory-discharge claims. Because Roberts hasn't offered enough evidence that Gestamp fired him in retaliation for exercising his FMLA rights, we affirm the district court's judgment on those claims.

## I.

## A.

## 1.

Gestamp is a multinational auto-parts manufacturer with a South Charleston, West Virginia facility. Before he was terminated, Roberts worked on the assembly line there.

Gestamp maintains written attendance and leave policies, which are at the center of this dispute. The company requires that employees notify their group leader via a call-in line at least 30 minutes before their shift begins if they'll be late or absent. Each employee receives a card with the call-in number, and the number is posted on a company bulletin board. If an employee misses three consecutive shifts without calling in, Gestamp will consider the employee to have abandoned his job and will terminate him.

## 2.

In June 2019, Roberts underwent an emergency appendectomy. While at the hospital, Roberts sent his group leader, Gary Slater, a Facebook message notifying him of the situation. Roberts used Facebook because, shortly before this surgery, Slater had messaged him on the app to communicate about an unrelated infection that caused Roberts

3

to miss work.  As with the earlier infection, Slater corresponded with Roberts on Facebook Messenger over several days after his surgery.

In those messages, Roberts told Slater he'd miss two weeks of work to recover from the surgery.  Roberts also dropped off a doctor's note at Gestamp's facility excusing him for that period.

But right before Roberts was to return to work, his surgical wound became infected. The hospital readmitted him for treatment.  As with his first hospitalization, Roberts messaged Slater on Facebook to tell him he was back in the hospital.  He also asked for human resources' fax number to send in paperwork extending his leave period.

A few days later, Slater asked Roberts—again, using Facebook Messenger—how long he'd be out of work.  Roberts responded, "I have no idea.  I go back to the doctor [July] 23rd and that's when they might take out the catheter.  So it's hard to tell how long." J.A. 550.  On July 25th, Slater messaged Roberts for an update, and Roberts replied that he still wasn't sure when he'd be able to come back.

After another week, Roberts's doctor cleared him to return to work on August 12th. Roberts shared that date after Slater requested an update.  *See* J.A. 549 ("Any word on when you will be released[?]").  And he brought a copy of his doctor's note to the facility.

Gestamp agrees that Roberts was on FMLA leave from June 27 through August 12, 2019.

### 3.

When Roberts returned to work on August 12th, he worked four days without issue. But on Friday of that week, Roberts felt pain around where the infection had been.  He

4

messaged Slater on Facebook asking to see him. Roberts later testified that he told Slater about the pain. Slater purportedly responded, "[Y]ou know your body better than anybody, so you do what you think you need to do." J.A. 136. Roberts also testified he said he "was thinking about going back to the hospital." *Id*. To this, Slater didn't respond. For his part, Slater said he only remembered that Roberts "did not feel good and that he had to leave." J.A. 447. Roberts left work early.

The following Monday, Roberts messaged Slater: "Not going to make it in today. I'm in so much pain and when I went to the hospital Friday I really never got an answer of why I'm in a lot of pain but I do have a work excuse for Friday." J.A. 548. Slater didn't respond.

The next day, on August 20th, Roberts messaged Slater again: "Hey." J.A. 548. Slater responded, "What's up." *Id.* Roberts replied, "The doctor is admitting me back into the hospital[.] He thinks the infection is coming back[.] Have no idea how long I'll be in there." *Id.* Slater didn't answer. At his deposition, Slater admitted to reading the messages but couldn't recall when. Roberts contends that the app's read receipts show Slater opened the messages before Roberts returned to work on September 3rd.

Roberts had a scheduled vacation day on the day he returned to the hospital. But the next day, Slater reported Roberts's absence to human resources. Slater couldn't recall whether he mentioned Roberts's hospital stay. But Gestamp's human resources manager, Scott Hughes, testified that Slater didn't mention why Roberts missed work.

Here, things get muddled. Hughes claims that he terminated Roberts for job abandonment on August 28th, effective August 21st. Roberts, however, contends that

5

Gestamp fired him on the 21st. He points to the company's "Termination Checklist," which lists his termination date as August 21st. J.A. 37. The only other evidence of Roberts's termination date is a payroll screenshot. The top of the page says, "Terminated on 8/28/19." J.A. 565. But the entry for 8/21/19 says, "Terminated for job abandonment." *Id.*

Ultimately, Roberts returned to the facility on September 3rd with a doctor's note covering his absence. He learned then that Gestamp had fired him.

## B.

Roberts sued Gestamp for FMLA interference and retaliation, as well as wrongful discharge under West Virginia law.[1] Roberts and Gestamp cross-moved for summary judgment.

The district court grouped together the FMLA claims and addressed them first. It explained that, even though an employee needn't use "magic words" to notice FMLA leave, "[a]n employer is expressly allowed to require employees to comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances." *Roberts v. Gestamp W. Va., LLC*, No. 2:19-cv-00854, 2020 WL 6142258, at *4 (S.D. W. Va. Oct. 19, 2020) (cleaned up). So "[t]he primary issue in [the] case [was] whether [Roberts's] failure to notify [Gestamp] of his August 21-30, 2019

---

[1] Roberts also sued Gestamp under the Americans with Disabilities Act and the West Virginia Human Rights Act. Below, Roberts didn't contest summary judgment on his ADA claims. And he doesn't appeal the district court's judgment on his Human Rights Act claims.

6

absence through the approved call-in line violated [the company's] usual and customary notice and procedural requirements for requesting leave." *Id.*

The district court found that "where an employee fails to comply with usual and customary notice requirements, FMLA claims fail." *Id.* at \*6 (citing *Peeples v. Coastal Off. Prods., Inc.*, 64 F. App'x 860, 863–64 (4th Cir. 2003) (per curiam)). And it rejected Roberts's argument that Gestamp modified its usual call-in procedure given his past communications with Slater over Facebook Messenger. So the court held that Roberts's FMLA claims failed because he didn't use the call-in line and "no unusual circumstances justified" his failure to do so. *Id.* The court also found that Roberts's common law wrongful-discharge claim fell alongside his FMLA claims.

The district court therefore denied Roberts's summary judgment motion and granted Gestamp's. This appeal followed.

## II.

We review an order granting summary judgment de novo, applying the same standards as the district court. *See Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). "At the summary judgment phase, the pertinent inquiry is whether there are any genuine factual issues that" only a factfinder can resolve "because they may reasonably be resolved in favor of either party." *Id.* (cleaned up).

In deciding whether the nonmoving party has raised a genuine dispute of material fact, we must view the evidence in that party's favor "and refrain from weighing the evidence or making credibility determinations." *Id.* (cleaned up). "A court improperly

7

weighs the evidence by failing to credit evidence that contradicts some of its key factual conclusions, or by failing to draw reasonable inferences in the light most favorable to the nonmoving party." *Id.* at 659–60 (cleaned up).

III.

We begin with Roberts's FMLA-interference claim. No one disputes that Roberts's condition was FMLA-qualifying or that firing him during FMLA leave would interfere with his rights under the Act. So this claim turns on whether Roberts provided Gestamp adequate notice of his need for FMLA leave beginning August 20th.

The notice issue is layered. First, we ask if Roberts has raised a jury question on whether Facebook Messenger was an acceptable *medium* to notify Gestamp of his absence. If so, then we consider whether a jury could find that the *content* of Roberts's notice satisfied his FMLA obligations. We think a reasonable jury could side with Roberts on both counts.

A.

To start, we offer some background on employees' and employers' respective rights and obligations under the FMLA.

1.

To prove FMLA interference, "an employee must [] demonstrate that (1) [they are] entitled to an FMLA benefit; (2) [their] employer interfered with the provision of that benefit; and (3) that interference caused harm." *Adams v. Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422, 427 (4th Cir. 2015).

8

"The FMLA 'provides no relief unless the employee has been prejudiced by the violation.'" *Vannoy v. Fed. Rsrv. Bank of Richmond*, 827 F.3d 296, 302 (4th Cir. 2016) (quoting *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)). So an employer may avoid liability if it shows it would have taken the contested adverse employment action regardless of the employee's FMLA leave. *See Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 547 (4th Cir. 2006).

### 2.

To qualify for FMLA leave, an employee must notify their employer of their need for leave. 29 C.F.R. § 825.301(b). "In providing notice, the employee need not use any magic words." *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 295 (4th Cir. 2009) (cleaned up). Rather, when leave is unforeseeable, "[a]n employee shall provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." 29 C.F.R. § 825.303(b).[2]

The FMLA regulations offer guidance on the information employees should provide. The notice should include "the anticipated duration of the absence, if known." *Id.*; *see also Peeples*, 64 F. App'x at 863 ("Employers are entitled to the sort of notice that will inform them not only that the FMLA may apply but also when a given employee will return to work." (cleaned up)). And when, as here, "an employee seeks leave due to a qualifying reason, for which the employer has previously provided the employee FMLA–

---

[2] Gestamp doesn't dispute that Roberts's need for leave, beginning August 20th, was unforeseeable.

protected leave, the employee must specifically reference either the qualifying reason for leave or the need for FMLA leave." 29 C.F.R. § 825.303(b).

Even "[w]hen the need for leave is not foreseeable, an employee must comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances." *Id.* § 825.303(c). "For example, an employer may require employees to call a designated number or a specific individual to request leave." *Id.* If an employee fails to do so, "FMLA-protected leave may be delayed or denied." *Id.*; *see also Srouder v. Dana Light Axle Mfg., LLC*, 725 F.3d 608, 615 (6th Cir. 2013) (affirming summary judgment against the plaintiff on an FMLA-interference claim where he "produced no evidence demonstrating the type of 'unusual circumstances' that would have justified his failure to follow the call-in requirements of [the company's] attendance policy").

### 3.

An employee's adequate notice of their need for FMLA leave triggers the employer's obligations under the Act. "The employer will be expected to obtain any additional required information through informal means." 29 C.F.R. § 825.303(b); *see also id.* § 825.301(a) ("In any circumstance where the employer does not have sufficient information about the reason for an employee's use of leave, the employer should inquire further . . . to ascertain whether leave is potentially FMLA-qualifying."). But employees have a corresponding duty to respond to an employer's inquiries. *Id.* § 825.303(b). In this way, "the FMLA presupposes that employers and employees will cooperate and exchange information." *Peeples*, 64 F. App'x at 863 (cleaned up).

10

After an employer has "acquired knowledge" that an employee is taking leave "for a[n] FMLA-qualifying reason," it "must notify the employee" that it's designating the leave accordingly. 29 U.S.C. § 825.301(a). "The employer is responsible in all circumstances for designating leave as FMLA-qualifying, and for giving notice of the designation to the employee." *Id.* § 825.300(d)(1). And "[i]f an employer's failure to timely designate leave in accordance with § 825.300 causes the employee to suffer harm, it may constitute an interference with, restraint of, or denial of the exercise of an employee's FMLA rights." *Id.* § 825.301(e).

One more wrinkle. When an employee seeks leave for a condition the employer has already found FMLA-qualifying, the employer needn't provide the employee with notice of their rights again. Rather, it must supply that notice only "at the commencement of the first instance of leave for each FMLA-qualifying reason." *Id.* § 825.300(b)(1).

With the FMLA's carefully calibrated allocation of rights and responsibilities in mind, we turn to the issues before us.

## B.

The first thing we must decide is whether a jury could find that Roberts used a "usual and customary" method to notify Gestamp of his need for leave after he was hospitalized on August 20th. Gestamp contends (and the district court agreed) that Roberts's interference claim fails because he didn't use the company's call-in line for reporting absences, despite his history of communicating with Slater over Facebook Messenger.

At the outset, we reject Roberts's first response—that he followed the letter of Gestamp's leave policy despite using Facebook Messenger instead of the call-in line. He

11

insists that Gestamp's policy "provides that an employee must only '*generally* . . . comply with the company's normal call-in procedures'" when noticing FMLA leave.  Appellant's Br. at 17 (quoting J.A. 537).

This is a tortured construction of Gestamp's policy, which says employees "*generally must* comply with the company's normal call-in procedures" in such circumstances. J.A. 537 (emphasis added).  In context, "generally" means "usually," which matches 29 C.F.R. § 825.303(c)'s exception for "unusual circumstances."

Still, the district court erred in resolving this issue at summary judgment.  The relevant FMLA regulation is more flexible than Gestamp and the district court suggest.  In short, it requires an employee to comply with an employer's "usual and customary notice and procedural requirements for requesting leave."  29 C.F.R. § 825.303(c).  And we agree with Roberts that "usual and customary" procedures include any method that an employer has, by informal practice or course of dealing with the employee, regularly accepted, along with those in the employer's written attendance policy.

The regulation's text supports this reading.  "Usual" means "expected based on previous experience, or on a pattern or course of conduct to date."  *Usual*, Black's Law Dictionary (11th ed. 2019); *see also Usual*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/usual ("accordant with usage, custom, or habit").  Similarly, "customary" means "commonly practiced, used, or observed," and "based on or established by custom."  *Customary*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/customary.  A plain reading of the phrase

12

"usual and customary" therefore includes methods of providing absentee notice that an employer has accepted as "a pattern or course of conduct to date" or "by custom."

At least one of our sister circuits has read § 825.303(c) the same way. In *Festerman v. County of Wayne*, the Sixth Circuit considered whether submitting a doctor's note might have satisfied the plaintiff's notice obligation even though the County's "usual notice procedures required submittal of a written leave of absence request." 611 F. App'x 310, 316 (6th Cir. 2015). The plaintiff offered evidence that, despite the formal leave procedure, "the common[,] unwritten practice of Wayne County was to grant leave based solely on the submittal of a doctor's note." *Id.* at 317.

> Reversing the district court's summary judgment order, the court explained,
>
> A plain reading of ["usual and customary"] reveals that an employer may require compliance with the employer's ordinary custom. Nothing in the regulation . . . suggests that an employee must adhere to an official written policy to provide sufficient notice under the FMLA when a different unwritten custom is typically followed.

*Id.* at 316–17. We agree.

So too, one court in our circuit has suggested that evidence an employer has allowed absentee-notice methods other than an official call-in line supports finding FMLA compliance. *See Honeycutt v. Balt. Cnty., Md.*, No. 06-0958, 2006 U.S. Dist. LEXIS 49315, at *11 (D. Md. July 7, 2006) (rejecting the County's argument faulting the plaintiff for failing to follow its call-in procedure in part because the plaintiff "ha[d] alleged that the [] call-in procedure was not the 'usual and customary [method] for requesting leave' because the County permitted her co-workers to use [a] 24-hour hotline, . . . and [had] allowed her to use it [previously]").

13

Gestamp urges a different reading of *Honeycutt*, arguing that the "court's decision to deny the employer's dispositive motion was not grounded in a potential modification of notice procedures through conduct." Appellee's Br. at 29. Rather, it says, the decision "was principally based on language in a previous version of 29 C.F.R. § 825.302(d) that precluded employers from denying leave for failing to follow internal procedures so long as the employee 'gives timely verbal or other notice.'" *Id.* (quoting 29 C.F.R. § 825.302(d) (1995)). We disagree. The *Honeycutt* court gave several, equally weighted reasons for denying summary judgment—one being the language Gestamp cites from the former version of § 825.302(d) and another being the plaintiff's argument that the employer's call-in procedure wasn't its (only) "usual and customary notice" procedure. *See Honeycutt*, 2006 U.S. Dist. LEXIS 49315, at *10–12.

The FMLA regulations do envision that "usual and customary" notice procedures may include absentee call-in lines. *See* 29 C.F.R. § 825.303(c) ("[A]n employer may require employees to call a designated number or a specific individual to request leave."). But that's just one example. Nothing in the regulations' text limits the reach of "usual and customary" to a company's written policy. And even if an employer's written leave policy is prima facie evidence of what's "usual and customary," the regulations don't bar an employee from supplementing that presumption with evidence that the employer also accepts informal absentee notice in practice.

With this view of the regulations, Roberts has raised a genuine factual dispute over whether it was "usual and customary" to report his absences by messaging his supervisor on Facebook. Roberts's Facebook messages with Slater show that they routinely discussed

14

his appendicitis and resulting hospital stays over that medium. Roberts informed Slater about his surgery and first infection-related hospitalization on Facebook Messenger. Slater responded via the app with follow-up questions about Roberts's status and expected return dates. Neither Slater nor anyone else at Gestamp disciplined Roberts for using Facebook Messenger over this period or asked that he use the call-in line instead. And Gestamp credited Roberts with FMLA leave on those earlier occasions.

It's true, as Gestamp emphasizes, that a few months before Roberts's appendectomy, Slater disciplined him for failing to use the call-in line for an unrelated absence. But as we've said, on another occasion, Slater used Facebook Messenger to ask Roberts about an infection for which he missed work. And Roberts wasn't disciplined for not using the call-in line then.

What's more, Gestamp conceded that Roberts's use of Facebook Messenger to notify Slater about his first surgery was acceptable because it was an emergency. *See* Appellee's Br. at 15 ("Using Facebook [M]essenger in that situation was an . . . exception to the call-in policy for emergencies."). The company doesn't offer a plausible reason for treating his hospital stay beginning August 20th any differently. Indeed, it suggests the circumstances were similar. *See* Appellee's Br. at 25 ("At most, there was an unusual circumstance[] or emergency only on August 20 when Roberts was admitted to the

15

hospital.").[3]  So properly construing the evidence in Roberts's favor, a reasonable jury could find that his Facebook messages to Slater satisfied Gestamp's "usual and customary" notice procedures under the FMLA.

C.

Assuming now that Roberts used an acceptable medium to notify Gestamp of his need for FMLA leave, we must decide whether a reasonable jury could find the notice itself was adequate.  To do so, we'll consider Roberts's leave period in two parts: (1) his hospital stay from August 20th–23rd and (2) his recovery period at home from August 24th–September 3rd.

1.

First, we have no trouble concluding that Roberts's Facebook messages to Slater on August 20th provided adequate FMLA notice for his hospital stay.

Roberts said, "The doctor is admitting me back into the hospital[.]  He thinks the infection is coming back[.]  Have no idea how long I'll be in there."  J.A. 548.  These messages reference the infection for which Roberts had already received FMLA leave.  So there's no question Roberts "provide[d] sufficient information for [Gestamp] to reasonably determine [that] the FMLA may apply to the leave request."  29 C.F.R. § 825.303(b).

---

[3] Gestamp points out that Roberts provided corroborating doctors' notes following his previous Facebook messages.  But under Gestamp's written policy, that would make no difference because the company wouldn't accept such notes as notice.  And because both notes came *after* Roberts and Slater had discussed Roberts's absences over Facebook, a jury could reasonably infer that the Facebook messages, rather than the notes, were the communications on which Gestamp relied when crediting Roberts with FMLA leave.

16

True, FMLA notice should generally specify when an employee will be able to return to work. But an employee facing a medical emergency can't give information they don't have. *See* 29 C.F.R. § 825.303(b) (explaining notice should include "the anticipated duration of the absence, *if known*" (emphasis added)). So, as he'd done in the past, Roberts said he didn't know how long he'd be hospitalized.

Gestamp disputes whether and when Slater read Roberts's messages. Assuming this dispute even bears on the outcome, it too belongs with a jury. The message thread shows that Slater at least opened the August 20th messages some time before Roberts returned to work on September 3rd. J.A. 563; *see How do I know if a friend has seen a message I sent on Facebook?*, Facebook Help Center, https://www.facebook.com/help/344515832413191?helpref=related_articles ("When you message someone on Facebook, their profile picture will appear next to your message (on the right) if they've seen it."). Construing the evidence in Roberts's favor, Slater read the messages and failed to respond.

## 2.

Though we're satisfied that a jury could find Roberts provided adequate notice of his need for FMLA leave during his hospital stay, things get murkier from there. When Roberts left the hospital on August 23rd, he had a doctor's note clearing him to return to work on September 3rd. But he never told Gestamp this—over Facebook Messenger or otherwise. Nor did he call in any of his later absences. Under these circumstances, the question is whether Roberts or Gestamp had the burden to follow up on the status of Roberts's FMLA–qualifying leave.

17

But we needn't answer that question. A separate factual dispute may obviate the jury's need to consider this absence period at all: Roberts's termination date. Roberts contends that Gestamp fired him on August 21st—while he was in the hospital. If that's true, the company's FMLA violation was complete before Roberts knew his return-to-work date. Gestamp counters that Roberts was fired on August 28th, not the 21st.

The evidence cuts both ways. In Roberts's corner, Gestamp's "Termination Checklist" for his firing notes the termination date as August 21st. J.A. 37. Hughes explained, however, that he made the decision to fire Roberts on August 28th, *effective* as of August 21st. Gestamp also points to a payroll screenshot, which notes August 28th as Roberts's termination date. But on that same document, the entry for August 21st states that Roberts was fired for job abandonment. A jury might also consider a notice Roberts received in April 2019 that any future attendance violations would result in termination.

We think this conflicting evidence creates a genuine dispute of material fact. Crediting Hughes's explanation for the discrepancy would require weighing the evidence and judging his credibility, which we (of course) mustn't do at this stage. So construing the conflicting evidence in Roberts's favor, Gestamp fired him on August 21st—while he was hospitalized and after he provided adequate notice of FMLA leave. His FMLA–interference claim therefore should go to a jury.

D.

Gestamp's remaining arguments don't move us. To start, the company argues it satisfied any burden it had to follow up with Roberts on the status of his leave. It claims

18

two human-resources representatives tried to call Roberts on his home phone to "determine why he was absent." Appellee's Br. at 31.

We disagree that this contention warrants summary judgment for Gestamp. First, Roberts raises a factual dispute over whether those calls ever happened: Gestamp typically makes records of such calls, and there are no such records here. Second, even if human resources made those calls, we don't see how they could have been following up on Roberts's FMLA leave, as no one in that department knew about his Facebook messages to Slater. And third, had the company acknowledged Roberts's message saying he was in the hospital, human resources would have known it couldn't reach him on his home phone—even if (as Gestamp tells us) that was the only number they had on file. For these reasons, there's at least a factual dispute on whether Gestamp complied with its FMLA obligations.

Gestamp also contends it "had a legitimate, nondiscriminatory reason for terminating Roberts: his violation of Gestamp's call-in and attendance policies." Appellant's Br. at 34. And it's true that, in FMLA–interference cases, "an employer can avoid liability . . . if it can prove that it would not have retained an employee had the employee not been on FMLA leave." *Yashenko*, 446 F.3d at 547 (cleaned up).

But here, Gestamp's proffered reason for firing Roberts simply restates the core dispute in this case. If a jury resolves the notice issue in Roberts's favor, then he needn't have followed Gestamp's written call-in and attendance policies. So *Yashenko* offers the company no relief.

19

*      *      *

At bottom, our disposition recognizes that the adequacy of an employee's notice of their intent to take FMLA leave "is an intensely factual determination." *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012). We think the many disputes here are best left in a jury's capable hands.

## IV.

We turn now to Roberts's FMLA-retaliation and common law retaliatory-discharge claims. Because Roberts hasn't offered evidence that improper animus motivated Gestamp's decision to fire him, we affirm the district court's judgment against Roberts on both counts. We'll take them in turn.

## A.

"The FMLA prohibits employers from discriminating against an employee for exercising [their] FMLA rights." *Hannah P. v. Coats*, 916 F.3d 327, 347 (4th Cir. 2019). We apply the *McDonnell Douglas* burden-shifting framework to FMLA-retaliation claims. *Id.*; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). "To establish a prima facie case of FMLA retaliation, a plaintiff must demonstrate that (1) [they] engaged in a protected activity; (2) [their] employer took an adverse employment action against [them]; and (3) there was a causal link between the two events." *Hannah P.*, 916 F.3d at 347 (cleaned up).

20

If the plaintiff succeeds on this front, "the burden shifts to the defendant to provide a legitimate, nonretaliatory reason for taking the employment action at issue." *Id.* And if the defendant so provides, the plaintiff may still prevail if they can show pretext. *Id.*

Roberts's FMLA-retaliation claim fails because, even assuming he'd been on FMLA leave when Gestamp fired him, he can't show that exercising his FMLA rights caused his termination. Fatally, Hughes—who made the decision to fire Roberts—didn't know that Roberts tried to take FMLA leave.[4]

We've held that an employee can't establish a prima facie FMLA-retaliation case when the facts are "[in]sufficient to prove that the supervisors responsible for [the employee's] termination had knowledge of [their] FMLA request." *Wright v. Southwest Airlines*, 319 F. App'x 232, 234 (4th Cir. 2009) (per curiam); *see also Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) ("Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case"); *Strickland v. Water Works & Sewer Bd. of the City of Birmingham*, 239 F.3d 1199, 1208 (11th Cir. 2001) ("A decision maker cannot have been motivated to retaliate by something unknown to him." (cleaned up)). This principle forecloses relief.

---

[4] Slater couldn't recall whether he told Hughes about the Facebook messages. But Hughes testified he didn't. And Roberts never contends we should construe the evidence to assume Hughes had that knowledge.

21

Roberts resists this outcome, arguing "there is ample evidence for a reasonable jury to find causation between Gestamp's decision and Roberts'[s] FMLA rights." Reply Br. at 19. But he only discusses *Slater's* knowledge and conduct to show improper animus. Relying on our decision in *Hill v. Lockheed Martin Logistics Management*, Roberts argues we can impute Slater's motives to Hughes and Gestamp because "Slater was 'principally responsible' for the decision to fire" him, even if he wasn't the "formal decisionmaker." *Id.* at 20 (quoting 354 F.3d 277, 288–89 (4th Cir. 2004) (en banc) (cleaned up)).

We disagree. In *Hill*, we disavowed "a test that would impute the discriminatory motivations of subordinate employees having no decisionmaking authority to the employer, . . . simply because they have influence or even substantial influence in effecting a challenged decision." *Hill*, 354 F.3d at 291. We think Slater falls into this category of employee.

Even though the record shows that Slater had supervisory and some disciplinary authority, there's no evidence he had any role in terminating employees. Nor is there evidence he took a position on whether to fire Roberts. And while Slater's report that Roberts missed work may have substantially influenced Hughes's decision, no reasonable jury could find that Slater was the actual decision-maker behind Roberts's termination. So even if we accept Roberts's (dubious) showing of Slater's unlawful motives, Roberts's FMLA-retaliation claim still fails.

## B.

Roberts's common law wrongful-discharge claim fails for the same reason as his FMLA-retaliation claim. Like FMLA retaliation, West Virginia's common law wrongful-

22

discharge claim depends on an employer's motive.  In *Harless v. First National Bank in Fairmond*, the state's Supreme Court of Appeals held that an "employer may be liable to the employee for damages occasioned by [a] discharge" if "the employer's motivation for the discharge contravenes some substantial public policy principle."  246 S.E.2d 270, 275 (W. Va. 1978).  And in *Burke v. Wetzel County Commission*, the same court held that FMLA violations can support a *Harless* wrongful-discharge claim.  815 S.E.2d 520, 539 (W. Va. 2018).

Even though *Burke* doesn't expressly distinguish between FMLA-retaliation and interference claims, we agree with Gestamp that only FMLA retaliation can support a *Harless* wrongful-discharge claim.  *Harless* creates a cause of action "where the employer's *motivation for the discharge* contravenes" public policy.  246 S.E.2d at 275 (emphasis added).  Roberts is wrong to suggest that FMLA interference can support a *Harless* claim because, as he admits, an employer's "intent is irrelevant under an interference claim."  Appellant's Br. at 24 (citing *Sharif v. United Airlines*, 841 F.3d 199, 203 (4th Cir. 2016)).

Because summary judgment was proper against Roberts on his FMLA-retaliation claim, we affirm the district court's judgment against his common law wrongful-discharge claim, as well.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*

23